Doerfer, J.
The defendant, Christina Martin (“Martin”) was convicted of one count of first degree murder by a Bristol County jury (Carey, J., presiding)[1] on November 13, 1992. This matter is how before the Court for consideration of the defendant’s motion for a new trial under Mass.R.Crim.P. 30(b).[2] The defendant argues that a new trial is warranted because she received ineffective assistance of counsel and because of the Commonwealth’s failure to disclose critical exculpatory evidence prior to trial. For the following reasons, defendant’s motion for a new trial is ALLOWED.
The Evidence at Trial
The court has reviewed the entire transcript of the trial which took place before Justice Carey and a jury between November 2, 1992 and November 13, 1992. The highlights of the proceedings which are relevant to the pending motion are as follows.
Defendant was charged with causing the death of her boyfriend by putting LSD into his Jell-O. The motive alleged by the Commonwealth was financial greed.
The defendant and the decedent had been living together for many years. He was 61; she was 35. She had two children who lived with them. She was the beneficiary under his will. His estate which passed under the'will did not contain his major assets which were a home, owned in a joint tenancy with a third party, and a profit sharing plan of which his estranged wife was the beneficiary. In any event, defendant stood to take in excess of $20,000 which the Commonwealth alleged was sufficient motive.
There was ample evidence of the defendant’s intention to kill her boyfriend. She made numerous purchases from local teenagers of what she thought were drugs. She told them that she intended to use the drugs to kill her boyfriend. The teens, showing some common sense and an enterprising spirit, sold her bogus drugs.
The decedent suffered from coronary artery disease and had undergone a multiple bypass operation several years earlier. Defendant was aware of her boyfriend’s heart condition. There was evidence that she thought the drugs would be lethal, given his health condition.
There was evidence that defendant eventually succeeded in obtaining real drugs. The parties' to the transaction believed the drugs to be eight hits of mescaline. There was evidence that the substance involved had some hallucinogenic properties: the drug dealer, Ali Mustafa, testified that he tried some from the same batch and it kept him laughing all night. The defendant’s daughter, Teasha, assisted her mother in purchasing the drug. There was evidence that Teasha took one hit and said “This is real.” There was evidence Teasha had used mescaline and LSD before, and in her opinion mescaline makes you giggly but LSD makes you see things that aren’t there.
At trial, Teasha, who was fourteen at the time in question, testified that it was she, not her mother, who put the “mescaline” into the Jell-O and gave it to the boy friend. But the Defendant had earlier made admissions to family members and others that she, the Defendant, had administered the substance to her boy friend.
Teasha testified that she had been the victim of sexual abuse by the boy friend. She and the defendant both testified that the mother was outraged at the boyfriend and had promised Teasha that she would make him hurt for his misdeeds. They both testified that the defendant, at the last moment, could not go through with the plan. Teasha, feeling betrayed by her mother, testified that she administered the substance herself to the boyfriend.
*296 The Commonwealth sought to impeach Teasha and the Defendant on their story that the mother withdrew from the plot and that fourteen-year-old Teasha went through with it on her own. The Commonwealth also argued joint venture.
At trial the issue of cause of death was barely contested. The Commonwealth presented expert testimony from the medical examiner who was a pathologist; a chemist; a toxicologist and a physician who was an expert on heart disease. Although he had consulted with a well known toxicologist, defense counsel presented no experts. His cross examination of the Commonwealth’s witnesses is alleged to have omitted substantial lines of inquiry of which the expert toxicologist he had retained would have advised him about. The focus of the pending motion is whether the defendant was deprived of a substantial defense by this performance of counsel and, of course, whether trial counsel had met the standard of the “average fallible lawyer.”
Cause of Death: The Expert Testimony at Trial
The scientific evidence relating to cause of death was as follows. After suspicion focused on the defendant, the body of the victim was exhumed. Thirty-one days had expired from the date of death. The body had been embalmed. Ground water had gotten into the casket. One purpose of the exhumation and autopsy was to test for the presence of mescaline, which was the substance supposedly administered to the decedent by the defendant (or her daughter). The overall purpose was to determine the cause of death. Thus, the focus was both on toxicological and cardiac issues.
The autopsy revealed that the decedent suffered from coronary artery disease and that his remaining native coronary arteries were obstructed. The bypass arteries were working well. There was no sign of a recent heart attack, according to the Commonwealth’s pathologist.
Samples of body fluids were taken from various parts of the body. There was very little that had not been mixed with embalming fluid but there was some.
The fluid samples were divided into two lots. One was sent to the state police crime lab; the other to an outside laboratory in order to get quicker results.
The pathologist testified that he received back the results of the toxicology analysis. He was allowed to testify as to the results on the representation that confirmatory testimony would be offered later at trial. His testimony was that LSD was found in all samples. Confirmatory evidence however was never admitted into evidence. There was no motion to strike this testimony that LSD was found in the body, and it was the only evidence that LSD was found in the decedent’s body.
He then testified that the cause of death was a combination of “acute LSD intoxication’’ and heart disease. In particular, he opined that the LSD caused the decedent’s heart to beat more violently and this increased stress on the heart caused death.
On cross, defense counsel got admissions that the witness had never seen a case in which LSD had caused death; that he had no idea of how much LSD was administered to the decedent and that the quantity found was “very small.” He also admitted that the LSD had to work in combination with a weakened heart and would not cause death by itself. He claimed that the decedent had an arrhythmia which he described as an abnormal heart beat that caused the heart to stop. Thus, at this stage, counsel had not abandoned the cause of death issue. His final question to the pathologist was, “Are you comfortable” with your testimony as to cause of death, to which the Commonwealth’s witness replied that he was.
The alarmed trial judge, at a bench conference, asked if defense counsel was deliberately down playing the cause of death issue by his cross. Defense counsel said it would be a mistake to try to resolve the “little issues.” From the entire transcript it is clear that his main defense was that the daughter did it and he wanted to concentrate on that.
From this episode and others at trial, and from the evidence received at the hearing on the motion for a new trial, it is clear that counsel did not appreciate the defects in the scientific evidence which he could have discovered if he had utilized the toxicology expert he had retained.
The Commonwealth’s next expert was Peter Amorusso, a clinical chemist and supervisor of toxicology at the Clinical Science Laboratory, a provider of contract services to the Commonwealth. He testified that he had done a screen for mescaline which turned up negative, ruling out the presence of mescaline in the samples. However, he suspected LSD from his experience that LSD is often substituted for mescaline on the street. He ran a screening test for LSD which was positive. He also testified, however, that the screening test was only a screen and that other tests were required before the presence of LSD could be confirmed. It is the lack of reliable confirmatory testing which is the focus of the evidence at the hearing on the motion for a new trial.
Amorusso testified that the effects of LSD were mainly psychological. Some physiological effects were also such as hypothermia, feeling hot and feeling cold. Also, variations in heartbeat, both tachycardia and bardycardia, were possible.
On cross, counsel hit a few points relating to the comprehensiveness of the testing and the effect of embalming, but did not pursue the confirmatory test issue.
*297 The Commonwealth finally addressed the need for a confirmatory test by putting on John Sloan, a chemist and toxicologist from the State Police Laboratory. He testified that gas chromatography mass spectroscopy (GCMS) would confirm the presence of LSD in a sample. He also testified that he was not able to confirm the presence of LSD by his testing.
He tried to testify that a laboratory in Philadelphia, National Medical Services, had- done confirmatory tests, but counsel’s objection was sustained. Again the trial judge questioned counsel on his lack of interest in this issue.
In his cross of Sloan, defense counsel referred to the confirmatory test as a “back up” test, but did not appreciate that, without a confirmatory test, the screening test was inconclusive. Counsel’s question to the witness was that one test confirmed the presence of LSD and the other didn’t. He treated the issue as one of contradictory results, not as a lack of a scientifically valid test. But he had not yet abandoned the cause of death defense.
Dr. Sagall, an expert in cardiology testified next for the Commonwealth. He elaborated on the physiological effects of LSD and also commented on the decedent’s heart condition. In his opinion the decedent was caused to go into ventricular fibrillation as a result of ingestion of LSD, based on the toxicological evidence.
Defense counsel explored on cross other possible causes of death relating to cardiac conditions. He agreed that the decedent was a candidate for sudden death due to emotional or physical stress. Counsel never explored this possible theory of a cause of death further. Dr. Sagall clearly relied on the presence of LSD in the body to form his conclusion that the decedent was caused to go into ventricular fibrillation. His was a differential diagnosis: in the absence of heart disease and in the absence of other causes of death and with LSD in the body “one would have to presume medically that LSD contributed to the death” he said.
Scientific Evidence Received at Motion for New Trial
The court heard testimony from three expert witnesses for the defendant and one for the Commonwealth. They were all qualified in their field.
The defendant’s experts, Brian E. Pape, PhD[3] and David Benjamin, PhD[4] were toxicologists: Richard Carleston, MD,[5] was qualified in the field of cardiology. The Commonwealth’s witness, William G. Hebard,[6] was as an expert in forensic chemistry. After hearing the testimony of these three experts and weighing the evidence, along with other evidence presented to the court I make the following findings of fact.
1. The evidentiary value and scientific reliability of standard toxicological tests used to detect the presence of LSD within the human body
Five standard tests are used to measure prior ingestion of drugs through the chemical examination of body fluid samples. The five standard tests are the radioimmunoassay (“RIA”) test, the enzyme multiplied immunoassay (“EMIT”) test, the gas chromatography-mass spectrometry (“GC-MS”) test, the high-pressure thin-layer chromatography (“HPTLC”) test, and the high-pressure liquid chromatography (“HPLC’j test. The following information on the standard tests is gleaned from the testimony of Pape, Benjamin and Hebard at the motion for a new trial and from the legal and scientific literature.
In an RIA test, antibodies of the “target” drug that is the subject of the test are mixed into a sample of a body fluid along with antigens of the antibodies, which are labeled with a radioactive isotope. If the target drug is present, it will compete with the antigen to bond with the antibody. Paul C. Gianelli and Edward J. Imwinkelreid, 2 Scientific Evidence 295 (1993). A similar process is used in the EMIT test, with one difference: the antigen is labeled with an enzyme rather than a radioactive isotope. Id. at 295. Apositive result on either of these tests indicates the presence of the drug or one of its cross-reactants. The result of an RIA or EMIT test is not correctly described as either “positive” or “negative,” since it could indicate the presence of a cross reactant rather than the suspect drugs. This raw quantitative result reported by the test is of low reliability and probative valúe.
The HPTLC test uses a very different technique: a portion of the sample is placed on a glass plate, which is then coated and placed in a tank containing development solution. The result of this procedure is that the sample moves along the plate, producing a streak that varies in length and color according to the compounds contained in the sample. Id. at 278.
The GC-MS test uses a separation procedure: the sample is converted into gaseous form and pushed through a long column containing helium gas. As the gaseous sample exits, it is bombarded by electrons that break it up into its chemical components. The components are analyzed by a mass spectrometer, which can identify the component substances according to the characteristic molecular pattern that emerges from the test and according to the amount of time taken by the sample to emerge from the column of helium.[7] A separation technique is also used in the HPLC test, except here the sample is moved through a liquid solvent, and the times at which the different components of the sample separate from the solvent are measured.
The RIA test, the preliminary test used by Dr. Sloan to discern the presence of LSD in the defendant’s body, is regarded by toxicological experts as a screening test that is of little or no probative value in itself unless accompanied by a more stringent confirmatory test. *298 Pape’s characterization of the test as essentially unreliable is confirmed by the manufacturers of the test, Hoffman LaRoche, who recommend that confirmatory tests be made once a positive result is obtained via RIA.[8] Furthermore, I accept that the standard, conventional practice recognized as most scientifically accurate among toxicologists is to report as negative any RIA test that was not confirmed by a more accurate confirmatory test, such as the GC-MS test.[9]
I also accept Pape’s opinion that the RIA test was designed for use with fresh urine samples, and that the accuracy of a RIA result would be impaired, should the test be made on stale urine samples or other bodily fluids. Furthermore, I accept the opinion of Benjamin that, during the 31 days in which the decedent’s corpse was buried, the possibility exists that ground water that seeped into the casket might have brought with it ergot fungus present in soil and grass and thereby contaminated the fluid samples that were tested by the Commonwealth. The RIA test is known by toxicologists to have difficulty distinguishing between a target substance and cross-reactants: ergot fungus has an extremely strong biochemical similarity to LSD and could therefore trigger a false positive result in a RIA test. Additionally, formaldehyde, which is present in embalming fluid, is a cross-reactant with LSD and could cause the RIA test to register a positive LSD result when performed on a clean sample of embalming fluid.[10] Other cross-reactants to LSD, such as sematonine and tryptophane, exist naturally in the human body. Hebard, the Commonwealth’s expert witness, conceded at the hearing on this motion that the physical decomposition of the decedent’s corpse could have decreased the reliability of the Commonwealth’s forensic testing.
Positive results on either the RIA or EMIT tests are of little probative value unless their results are confirmed by the use of a “separation technique” test, such as GC-MS or HPLC. See United States v. Bentley, 875 F.2d 1114, 1123 n.9 (5th Cir. 1989); David J. Greenblatt, M.D., Urine Drug Testing: What Does It Test?, 23 New Eng. L. Rev. 651 (1988); Lawrence Miike and Maria Hewitt, Accuracy and Reliability of Urine Drug Tests, 36 Kan. L. Rev. 641, 646 (1988). The EMIT test is regarded as the least accurate of the toxicological tests performed on urine samples. Taylor v. O’Grady, 888 F.2d 1189, 1192 n.4 (7th Cir. 1989). The HPTLC test is only slightly more reliable, and suffers from two serious flaws: first, there is a high probability that some chemical substances may produce streaks of identical length and color; and, second, the test involves a subjective element necessitated by the fact the test analyst must personally characterize the color of the streak before the result can be interpreted. Gianelli and Imwinkelreid, supra at 282. I accept the testimony of Pape, seconded by the testimony of Hebard, that the RIA, EMITS and HPTLC tests are considered preliminaiy screening tests and that toxicologists do not consider these tests to be of sufficient accuracy and reliability to produce definitive results without further confirmation. I accept the testimony of Pape that the HPTLC test requires modification before it can be used to detect LSD.[11] See also: Juris G. Cedarbaums and Selma Arnold, Scientific and Expert Evidence in Criminal Advocacy 405 (1975).
The GC-MS and HPLC tests are viewed by toxicologists as ideal confirmatory tests of high accuracy and reliability.[12] I accept the testimony of Pape, Benjamin and Hebard that the standard practice amongst toxicologists is to perform a confirmatory test using either of these techniques after an initial diagnosis is made via RIA, EMITS or HPTLC testing. The GC-MS test produces results of great accuracy because the separation process creates a set of fragmentation patterns that reveal the unique signatures of the molecules that make up the chemical compounds initially present in the sample. Gianelli and Imwinkelreid, supra at 314. While errors can occur due to malfunctioning equipment or incorrect interpretation of test results, the test does not produce a false positive result when it encounters a cross-reactant.[13] Charles E. Leal, Comment: Admissibility of Biochemical Urinalysis Testing Results for the Purpose of Detecting Marijuana Use, 20 Wake Forest L. Rev. 391, 396 (1984). I accept the testimony of Pape and Benjamin that the HPLC test involves a slightly higher risk of inaccuracy, because, in order for a test to be performed properly, variables such as room temperature must be calibrated to match those used in prior, published HPLC tests. The need for such variables to be identical comes from the testing procedure: in a HPLC test, the times at which different components separate from the liquid medium are measured and compared to the times determined to exist for different substances in published experiments. See, e.g., Greenblatt, supra at 656.
I accept Pape’s testimony that the GC-MS test is the preferred method to confirm the presence of a target substance within a body fluid sample. Furthermore, I accept Benjamin’s testimony that the scientific validity of a positive RIA or EMITS test, absent further confirmation, is negligible.
2. The probative value of the sample selection and forensic tests performed by the Commonwealth and introduced as evidence at trial to show that the deceased’s body contained LSD
A review of the transcript of defendant’s trial indicates that the Commonwealth performed three distinct series of toxicological tests using fluid samples from the corpse in an attempt to detect the presence of LSD.
The first set of tests were performed by Louis P. Amorusso, PhD, a chemist at the Clinical Science Laboratory (“CSL”). Amorusso’s initial instruction was *299 to screen the samples for the presence of mescaline. Amorusso’s preliminaiy testing failed to detect the presence of mescaline in any of the samples but instead detected diphenhydramine,[14] a chemical found in over-the-counter sleep and cold medications. As Amorusso was aware that LSD is occasionally substituted for mescaline by street dealers,[15] he subjected the samples to screening tests for LSD[16] and reached a “positive” result, at the screening level, for LSD in the samples of blood, urine ravage and vitreous fluids. Amorusso did not perform any confirmatory tests upon the tissue and fluid samples.[17]
Further testing was performed by the National Medical Services (“NMS") laboratory.[18] These results were never specifically admitted into evidence. Reference to them was permitted on the representation that direct evidence would come in, but it never did. The NMS toxicology report was signed by Fredric Rieders, PhD Neither Dr. Rieders nor any other representative of NMS testified at the defendant’s original trial. According to the NMS report, NMS tested four samples: intestinal contents and urine taken directly from the corpse, and cavity embalming fluid and arterial embalming fluid that were clean samples, not taken from the deceased.[19] NMS reached a preliminary positive result for LSD under RIA testing of the urine and intestinal contents. A HPTLC screening test was run on the intestinal contents: this test also reached a positive result for LSD. Successive HPLC confirmatory tests were performed, both of which registered positive results for LSD. The embalming fluids tested positive for LSD during RIA screening tests,[20] but negative during later HPTLC and HPLC tests.
A third report on the samples was prepared by John Sloane, PhD, a chemist at the Commonwealth’s Crime Laboratory. This report was based on all of the Commonwealth’s testing: that conducted by the Crime Lab as well as that conducted by the CSL and NMS labs. Dr. Sloan stated in his report that positive LSD screening results had been obtained for samples of the deceased’s blood, urine, cerebrospinal fluid, intestinal contents, vitreous fluid and chest fluid. Dr. Sloan attempted five confirmatory tests of the fluids using the GC-MS technique. Sloan was unable to confirm the results of any of the initially positive RIA tests using the GC-MS method.[21] Sloan concocted samples that mixed the deceased’s body fluids with LSD, and then tested them: he was able to reach a positive GC-MS result using these samples, indicating that the five previous negative results were not the result of defects in his testing equipment.
Thus, at trial, the court admitted the following forensic evidence at trial to support the Commonwealth’s contention that LSD had been ingested by the decedent: positive screening RIA and EMIT test results on the urine, blood and vitreous fluids performed by Amorusso; and further positive screening test results on a range of fluids performed by Sloan. Sloan reported that positive results via RIA tests had been reached with “chest fluid,” a term which apparently applies to embalming fluid. As the embalming fluid was apparently a clean sample, the positive result reported by Sloan would seem to tarnish the rest of his findings with diminished credibility. On cross-examination, Amorusso mentioned, without objection, that a positive confirmatory result had been achieved, but this remark appears to have no evidentiary basis, unless it is interpreted as a reference to the inadmissible hearsay contained in the NMS report: this report, the only report containing positive confirmatory results for LSD, was specifically excluded from evidence by the trial judge.[22]
The defense attorney was aware of the weakness of the Commonwealth’s scientific evidence. I accept the testimony of Pape that he informed the defense attorney of the weakness of the Commonwealth’s forensic evidence during discussions of pre-trial strategy. However, as the defense counsel did not have knowledge of the number of negative test results achieved by Sloan, counsel may not have appreciated the full extent of the flaws in the Commonwealth’s toxicology evidence at the time he planned his trial strategy ánd determined the witnesses he would call. But he should have appreciated the advice he received from Pape of the distinction between a screening test and a confirmatory test. Evidence of this appreciation was not apparent at trial.
3. The evidentiary support for the Commonwealth’s theory of cause-of-death and the toxicological research regarding fatal LSD ingestion
The Commonwealth’s theory at trial was that while the immediate cause of the deceased’s death was myocardial infarction, the infarction was caused by tachycardia, or rapid, irregular heartbeat, a side-effect of LSD intoxication.[23]
There is no scientific basis for assuming that LSD could serve as a poison. LSD is considered to be a relatively non-toxic chemical compound in humans.[24] Charles L. Winek, PhD, Forensic Toxicology, in Forensic Sciences: Law/Science Civil/Criminal (Ed.: Cyril H. Wecht, M.D., J.D.) 31-48 (1996). “There have been no reports of death to humans due to the acute toxicity of LSD; but during acute psychotic episodes, accidental or intentional attempts and violent deaths have been reported.” Id. I accept Pape’s testimony that toxic levels of LSD in human blood and other fluids have not been conclusively ascertained.
Dr. Carleston testified at the hearing on this motion regarding the deceased’s susceptibility to cardiac arrest. I accept Carleston’s opinion that the deceased suffered from several risk-factors and problems that severely weakened his heart and rendered him unusually vulnerable to heart problems. These factors included: the deceased’s smoking; the. enlarged size of *300 his heart; high cholesterol; and, the fact that the deceased took medications containing nitrates. The deceased had experienced a 90% narrowing of his coronary arteiy, and, five years before his death, his left main artery was closed 95%. A double-bypass operation was performed to allow blood to circumvent the blocked left artery, yet did not cure the deceased’s heart disease. Additionally, in 1975 the deceased’s right artery had been 50% blocked[25] and was never bypassed. The deceased experienced temporary blindness in 1987, an indication of heart problems. Carleston testified that between 15% and 20% of persons with cases of heart disease as serious as that suffered by the deceased die within one year of diagnosis.
I accept the testimony of Dr. Benjamin that the consumption of LSD can result in tachycardia between thirty minutes and one hour after the moment of ingestion. Benjamin further testified that tachycardia is also a side-effect of diphenhydramine. The possibility exists, therefore, that the immediate cause of the decedent’s unnatural tachycardia, should it be assumed that he suffered such a thing, was the ingestion of over-the-counter sleep medication, rather than the ingestion of LSD.[26], [27]
Circumstantial Evidence of Cause of Death at Trial
Even though the evidence received on the motion for new trial shows that defendant was deprived of evidence and an argument that LSD was not found in the body or, on retrial, that the Commonwealth’s evidence of the presence of LSD would be subject to substantial impeachment, the court must consider whether the Commonwealth proved cause of death by the administration of a foreign substance even in the absence of scientific confirmation of the presence of the substance in the body of the decedent.
The evidence tending to show that some drug had been administered to the decedent was as follows: Teasha testified directly that she put a substance into his Jell-O. She had sampled the substance the day before and said that it was “real.” Ali Mustafa testified that he tried two hits and they made him laugh all night.
Other witnesses testified to admissions by the defendant that the defendant had put the drugs from Ali Mustafa into the Jell-O. These facts were sufficient to warrant a jury finding beyond a reasonable doubt that some form of drug had been ingested by the decedent.
There was further evidence that the decedent began to show distress ten minutes after he was given the Jell-O. Within a further short period of time he was dead.
His symptoms, according to the defendant and Teasha, were complaints of feeling hot and cold; he started screaming. The defendant also testified that he was sitting up with his hands on his knees.
The medical testimony at trial as to cause of death depended on the assumption that he had ingested LSD. There was no testimony as to the effect of any other drug such as mescaline. As to the possibility that he had actually been given mescaline, both Ali Mustafa and Teasha thought that is what the substance was. Mustafa’s reaction was consistent with mescaline, not LSD. Teasha who said “this is real” thought she was talking about mescaline, not LSD. She was familiar with both.
There was evidence at the hearing on the motion for new trial that it would take thirty minutes for LSD to have a physiological effect. Yet the testimony at trial was that the decedent reacted to the Jell-O within ten minutes.
Although eight hits were purchased from Ali Mustafa for forty dollars, Teasha had at least one herself. Two more were destroyed trying to break them up into a powder. Thus, at most, the defendant received five doses of the substance for which the price was five dollars each. The drugs had the appearance of mescaline and passed for mescaline on the street.
There was evidence at trial and at the motion for new trial that the decedent was a candidate for sudden death, based on his heart condition.
At trial there was extensive testimony, although not offered for that purpose, that the decedent was under considerable stress. According to the defendant and Teasha they had confronted him with Teasha’s allegation of long term sexual abuse a few weeks before his death. The jury could find that he took it badly. He became reclusive. He stopped going to work. His appearance deteriorated. He was throwing up.
On the night of his death Teasha had screamed at him. There was evidence that he was being shunned.
There was evidence at trial and on the motion for new trial that emotional distress can cause sudden death in persons with weak hearts.
All of this is recited to illustrate that, without reliable scientific evidence of the presence of LSD in the body of the deceased, the inference that the decedent was caused to die by the administration of a substance by the defendant or Teasha becomes much more debatable.
The short time between the serving of drug laced Jell-O and the decedent’s death appears to be a powerful circumstance connecting the act with the death. Yet these other pieces of evidence could well create a reasonable doubt that the drug caused the death, combined with absent or weakened scientific evidence on the presence of LSD in the body.
Justification for Granting a New Trial
A new trial will be granted “if it appears that justice may not have been done.” Mass.R.Crim.P. 30(b). In order to merit a new trial on the basis of ineffective assistance of counsel, the defendant has a heavy *301 burden of establishing that his attorney’s performance fell “measurably below that which might be expected from an ordinary, fallible lawyer” and that such inadequacies likely deprived the defendant “of an otherwise available, substantial ground of defense.” Commonwealth v. Brookins, 33 Mass.App.Ct. 626, 631 (1992), quoting Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). A defense attorney’s strategic or tactical decisions do not constitute ineffective assistance unless they are “manifestly unreasonable.” Commonwealth v. Parker, 420 Mass. 242, 248 (1995), quoting Commonwealth v. Bousquet, 407 Mass. 854, 863-64 (1990). The choice between contradictory defenses or defense strategies is a tactical one and cannot be the basis for a successful claim of ineffective assistance of counsel.[28] Id.
From the evidence taken at the motion for new trial, and from reviewing the transcript, it is quite evident that defense counsel did not appreciate that only a screening test had been offered in evidence which was of no probative value without a confirmatory test. The concept of a “confirmatory test” was completely missed at trial. The fact that the screening test had no value without a confirmatory test did not register in any of trial counsel’s statements or actions.
Although the details of why the screening test in this case is not reliable involve sophisticated scientific concepts, it is not conceptually difficult to distinguish between a test which screens for a substance but which then requires confirmation in order to be relevant. In this case trial counsel regarded the screening test as merely cumulative.
Pape had been retained by defense counsel and was prepared to explain this problem to the jury, the judge and, for that matter, to counsel. Failure to use him is difficult to understand. Could it be justified as a tactical decision?
This involves a consideration of whether the defense attorney’s decision not to develop this theory can be justified as a necessary choice between conflicting defenses: the defense of blaming Teasha as the primary perpetrator of the crime; and, the defense that the Commonwealth had not proven cause-of-death beyond a reasonable doubt.
Second, the court will consider the gravity of counsel’s decision to drop the cause-of-death defense and discuss the significance such a defense might have had to the defendant at trial. As murder can be proven by circumstantial evidence, the court will consider how strong the Commonwealth’s evidence of murder would have been had the defendant fully explored the flaws in its toxicological evidence, and, therefore, whether the decision not to raise the cause-of-death defense falls below the level expected of an ordinary, fallible lawyer. Third, the court will move to the defendant’s argument that a new trial is warranted by the Commonwealth’s failure to provide exculpatory evidence, notably the fact that Sloan had made five negative confirmatory tests of his samples, to the defense prior to or during trial.
Turning first to the toxicological evidence before the jury, the trial court admitted into evidence a total of eight positive LSD screening tests (according to the RIA or EMITS method) and zero positive confirmatory tests (according to the GC-MS or HPLC method). The only reference to a positive result in a confirmatory test for the presence of LSD is contained in the unchallenged testimony of Amorusso.[29] Defendant’s trial counsel did not explore, through either cross-examination or other evidence, the difference in probative value between screening and confirmatory tests or the lack of evidence supporting the Commonwealth’s cause-of-death hypothesis, beyond the bare fact that LSD is normally considered non-toxic. Specifically, counsel failed to: advance the hypotheses that ergot fungus and embalming fluid acted as cross-reactants, invalidating the RIA test results; object to Amorusso’s statement mentioning the positive confirmatory tests without factual basis;[30] or offer the hypothesis that diphenhydramine was the actual cause of Alfredo’s tachycardia. Assuming, therefore, that the defense had available the option of discrediting every piece of evidence that the Commonwealth presented at trial to show that Alfredo’s corpse containing LSD, the court ■will now consider if the failure to pursue this option justifies a new trial.
While the appellate courts have denied new trial motions based on an omitted defense theory where the defense was self-evident from the evidence before the jury or given adequate explanation in the jury instructions, the record of Martin’s trial reveals that the jury would not have ascertained or understood the cause-of-death defense without further cross-examination by defense counsel or the presentation of expert testimony. Commonwealth v. Parker, supra[31] (the defense of intoxication was explained in the instructions and no new trial was therefore merited). In other words, the testimony of other witnesses and the trial judge’s instructions to the jury did not sufficiently explain the flaws in the Commonwealth’s evidence, thereby curing defense counsel's failure to present the cause-of-death defense.
Additionally, the appellate courts have denied similar motions where the omitted defense was merely cumulative, of only speculative value or actually harmful to the overall defense. See, e.g.: Commonwealth v. Martinez, 420 Mass. 622 (1995) (failure to call a ballistics expert not ineffective assistance where expert testimony would not have provided relevant exculpatory evidence); Commonwealth v. Gould, 413 Mass. 707 (1992) (counsel’s failure to raise insanity defense did not constitute ineffective assistance where facts known regarding defendant’s mental state failed to raise a reasonable doubt about defendant’s mental condition); Commonwealth v. Fionda, 33 Mass.App.Ct. 316 (1992) (counsel’s failure to conduct expert chem *302 ical analysis of cells found on a bottle not ineffective assistance where the results, even if the most favorable possible results, would have no real probative value).
Furthermore, the appellate courts have denied new trial motions where the omitted defense was so strongly contradicted by the evidence at trial that it could not have added significant support to the defendant’s case even if zealously presented and argued. See, e.g.: Commonwealth v. Robbins, 422 Mass. 305 (1996) (substantial evidence at trial negated value of intoxication defense); Commonwealth v. Mello, 420 Mass. 375, 394-95 (1995)[32] (substantial evidence existed that defendant possessed the requisite intent, thereby rendering the presentation of an intoxication defense futile).
As causation is an essential element of the crime of firstrdegree murder, and as no direct evidence of cause-of-death existed outside of the toxicology and autopsy evidence introduced by the Commonwealth, the court assumes for now that the cause-of-death defense was an important component of the defendant’s arsenal at trial.[33] The court therefore turns to the judgment of the tactical advantages and disadvantages that could have influenced trial counsel’s decision to exclusively pursue the defense at trial that Teasha was solely responsible for the crime. The court is mindful that “the test [for motions for a new trial] is not to be made with the advantage of hindsight" and that, if the decision not to proffer the testimony of Pape or further cross-examine Amorusso and Sloan is justified by bona fide tactical reasons, the court will not view this decision as the product of ineffective assistance of counsel. Commonwealth v. Parker, supra, quoting Commonwealth v. Adams, 374 Mass. 722, 729 (1978).
There were no real potential tactical disadvantages that could have arisen from the exploitation of the cause-of-death defense at trial. Greater cross-examination of the Commonwealth’s forensic witnesses carried no risk of impliedly waiving defendant’s objections, on hearsay grounds, to the admissibility of the National Medical Center report. Cross-examination of Amorusso regarding his statement, made without obvious factual basis, that positive confirmatory results had been reached on the samples he had tested carried no risk of getting those results in.[34]
Similar dangers would not have arisen as a result of more stringent cross-examination of Sloan. The central flaw in Sloan’s analysis was the fact that he had performed five negative confirmatory tests on the samples; Sloan admitted to the existence of at least one failed test during his trial testimony in a vague reference that did not deny the possibility that more than one negative result had been reached.[35] Counsel could not have explored Sloan’s five negative tests as he was not aware of them at the time of trial.[36]
A minor tactical disadvantage could possibly have arisen had the defense presented complex expert toxicological evidence before the jury. Such evidence is by its nature confusing to lay persons and might arguably have confused the jury or exasperated them, leading them to develop a prejudice against the defendant. Here, any confusion that could have resulted from the presentation of rebuttal toxicology evidence is outweighed by the probative value of presenting a defense that might have thrown into doubt a crucial element of the Commonwealth’s case. The potential for juror confusion cannot be logically perceived to justify a decision to omit a defense that had the potential to cast serious doubt on the Commonwealth’s evidence. As will be discussed, infra, a defense that portrayed the Commonwealth’s toxicological tests as lacking in scientific reliability would have an undeniable potential to prevent the Commonwealth from satisfying its burden of proof at trial.
An effective presentation of the cause-of-death defense would not have been logically inconsistent with counsel’s primary theory at trial: that Teasha placed the poison in Alfredo’s Jell-O despite Martin’s decision not to go ahead with the planned murder. It would have been possible for trial counsel to argue the two defense theories: first, that the Commonwealth had not proven beyond a reasonable doubt that Alfredo’s body contained LSD, opening up the possibility that he died of cardiac arrhythmia caused by some other factor; and second, that the Commonwealth had not eliminated the possibility that Teasha, motivated by the need to revenge years of sexual abuse, poisoned Alfredo despite her mother’s withdrawal and condemnation of her earlier plan. Alternatively, the defense could have argued that the fatal cardiac arrythmia that immediately caused Alfredo’s death was extreme mental or emotional distress in reaction to their accusations or a side-effect of diphehydramine, not LSD.
In Commonwealth v. Aviles, 40 Mass.App.Ct. 440 (1996), the Appeals Court ordered a new trial on the basis of an omitted defense ineffective assistance theory. There, the court considered the ramifications of counsel’s failure to explore an alibi defense to rape.[37] First, the defense attorney mentioned in his opening that the defendant’s evidence “will be mainly, first of all, evidence of an alibi." The defense attorney then failed to call several witness who could have substantiated this alibi: most notably Dr. Schaetske, a chiropractor who had seen the defendant; but, also Caprera, the defendant’s civil attorney who was suing in tort the persons alleged to have injured defendant in an auto accident, Mason, the defendant’s insurance agent, Collasso and Morales, neighbors of the defendant who saw him on crutches, and Rivera, who was *303 a passenger in the defendant’s car during the accident. Trial counsel had attempted to reach Dr. Schaetske, but she never heard from him.[38]
At trial, only the defendant, his mother, his father and thirteen-year-old sister testified regarding the defendant’s physical condition and their testimony was limited to answering of a brief question about whether the defendant was on crutches. The Appeals Court depicted the questioning of the defendant, who took the stand, regarding his injuries as “a grossly inadequate preparation of the witness.” Id. at 445.
The Appeals Court concluded that Schaetske was the only witness who could authoritatively testify as to the defendant’s physical condition and hence support his alibi defense. The court stated that the omission of her testimony and the testimony of the other omitted witnesses was made for no sound tactical reason. The omission of the potentially corroborating testimony made the defendant’s remarks concerning physical limitations lack credibility. The attorney jettisoned the alibi defense at closing for a weak defense that the complainant had psychological problems and that the rape never happened (although the Commonwealth had overwhelming evidence to refute this). The court recognized that the alibi defense here was not a perfect defense: in fact, the court concluded that the alibi defense suffered from internal inconsistencies. Id. at 446 n.9.
Additionally, the court attacked trial counsel’s decision not to offer evidence probative of the defendant’s character. The defendant had no arrests or convictions on his record. The charge alleged that a supposedly mild-mannered person had acted with ferocity: this, the court stated, should have been contradicted by character evidence supplied by the defense.
Assuming, arguendo, that the cause-of-death defense was of comparable strength to the alibi defense omitted in Aviles, the failure of trial counsel to pursue this defense constitutes ineffective assistance. Commonwealth v. Aviles, supra; Commonwealth v. Brookins, supra (counsel’s failure to subpoena an alibi witness whose testimony was exculpatory in the extreme constituted ineffective assistance). The court’s estimation of the probative value and tactical strength of the cause-of-death defense allows for the fact that this defense can suffer from some internal inconsistencies and still rise to the level accorded the alibi defense by the Appeals Court in Aviles. Commonwealth v. Aviles, supra.
The court moves now to evaluate the actual strength of the cause-of-death defense. While the defendant may dispute the causal relationship of Alfredo’s LSD ingestion to his death, the defense cannot successfully argue that Alfredo’s cardiac health was so weak that his death was inevitable. “The law does not permit a party charged with murder to speculate on the chances of the life of his victim, or to endeavor to apportion his own wicked act by dividing its effects within the operation of natural causes on the body of the deceased.” Commonwealth v. Fox, 7 Gray 585, 587 (1856). The defendant cannot successfully argue that her acts are absolved because Alfredo’s heart disease was the primary cause of his death, either. “Disease, intoxication, use of morphine, prior wounds, prolonged exposure . . . may contribute to the death without destroying the culpability of the act of the accused.” James J. Focht, Jr., Proximate Cause in the Law of Homicide—With Special Reference to California cases, 18 S. Cal.L.Rev. 19 (1938) (citations omitted); see, e.g. Commonwealth v. Souza, 34 Mass.App.Ct. 436, 437-40 (1979). Any act hastening death by the briefest measurable period of time can be the basis for culpable homicide. Id. at 26.
In Massachusetts, first-degree murder may be proven beyond a reasonable doubt through the presentation of circumstantial evidence. Commonwealth v. Rojas, 388 Mass. 626, 629 (1983); Commonwealth v. Starling, 382 Mass. 423, 425-27 (1981); Commonwealth v. Latimore, 378 Mass. 671, 677-78 (1979). To “conclude otherwise would mean that a criminal could commit a secret murder, destroy the body of the victim [or secrete it until advanced decomposition obscured the cause of death], and escape punishment despite convincing circumstantial evidence against him or her.” Commonwealth v. Nadworthy, 396 Mass. 342, 354, cert. denied 477 U.S. 904 (1985), quoting Wilkins v. State, 96 Nev. 367, 374 (1980), citing People v. Scott, 176 Cal.App.2d 458 (1959).
“The fact that the cause of death was not ascertainable from the body does not of itself preclude the Commonwealth from proving that the victim’s death was by violence and the criminal agency of the defendant beyond a reasonable doubt.”[39] Id., citing Commonwealth v. Webster, 5 Cush. 295, 308-09 (1850). Furthermore, in order to prove causation beyond a reasonable doubt, the Commonwealth need not eliminate the possibility that anyone but the defendant committed the murder. Commonwealth v. Rojas, supra at 629.
In Nadworthy, the evidence of cause-of-death was simply that: the victim was in the defendant’s apartment the last time she was seen alive, the defendant acknowledged that a large stain on his carpet was the victim’s blood, and there was no evidence supporting a theory of death by suicide or disease. Commonwealth v. Nadworthy, supra at 354-55. The one factor present there that was not seen at Martin’s trial was the defendant’s acknowledgment of the blood stain, indicating at the very least that the victim had suffered grave injury in the defendant’s apartment.
The circumstantial evidence used to prove guilt in Rojas bears a much stronger resemblance to the facts presented in the Commonwealth’s case against Martin. Commonwealth v. Rojas, supra. In Rojas, the *304 Commonwealth’s entire case consisted of evidence of the defendant’s consciousness of guilt and flight. Id. Rojas made false statements to the police, fled to Florida after a routine questioning, and gave a false name when apprehended. Id. at 628-29. A motive was plausible as, prior to the murder, the victim had on his person cash and jewelry, which vanished from the scene before the police arrived. Id. at 630. The fact that the assailant had entered the victim’s apartment without leaving signs of a struggle further pointed to defendant, who had apparently been invited into the apartment by the victim. Id. at 630. The defendant admitted he had been the last person to see the victim alive. Id. at 628. These facts added together to create a “fabric of proof sufficient to warrant” a conviction. Id. at 630. The evidence is comparable to that before the trial court here, where the defendant confessed to the crime, fled to another country and dyed her hair to escape identification.[40]
Circumstantial evidence has also been used in cases where the defendant was accused of homicide by poison. People v. Hanei, 81 III.App. 3d 690, cert. denied 450 U.S. 927 (1980).[41] For instance, in People v. Franszkiewicz, the prosecution offered sufficient evidence to convict defendant where the offer of proof of causation consisted solely of evidence that: (1) defendant had purchased a certain poison; and (2) that the victim died of that poison. People v. Franszkiewicz, 302 Mich. 144, 147 (1942). It was not necessary for the prosecution to prove that the defendant actually gave the victim poison, or inserted the poison into the victim’s food or drink. Id. at 147-49.
If the defense had been successful in rebutting the Commonwealth’s toxicological evidence, the remaining evidence presented by the Commonwealth at trial would have been much weaker and perhaps insufficient to prove the defendant guilty beyond a reasonable doubt. Proof that the victim, in his vulnerable condition, died from the ingestion of a drug was a fundamental, essential element of the Commonwealth’s case. They had almost no other issue. Both the defendant and Teasha had “admitted” murdering the victim: but the scientific evidence might establish that they were both wrong. Joseph R. Nolan and Bruce R. Henry, Criminal Law §121 (1988 & 1995 pocket part) (causation is “a fundamental requirement for criminal liability”); Wayne R. LaFave and Austin W. Scott, Jr., Substantive Criminal Law §312 (1986 & 1996 pocket part).
An attorney can provide ineffective assistance by failing to investigate and pursue a “plausible" alibi defense, Commonwealth v. Cepulonis, 9 Mass.App.Ct. 302, 305 (1980), even one marred by logical inconsistencies. Commonwealth v. Aviles, supra at 446 n.9. The law only requires that the omitted defense be “substantial,” not conclusive. Commonwealth v. Brookins, supra.
Failure to Provide Exculpatory Evidence
Turning finally to the issue of exculpatory evidence, Massachusetts follows United States v. Agurs, 427 U.S. 97 (1976), in setting out the standard for when a new trial must be granted after exculpatory evidence was withheld by the Commonwealth: when the evidence was specifically requested, a new trial is required if the evidence might have affected the outcome of the trial; where the evidence was requested as part of a general request, the standard is new trial if the evidence created a reasonable doubt that otherwise might not exist. Id. at 104, 112.
In Commonwealth v. Tucceri, 412 Mass. 401 (1992), the Supreme Judicial Court set out a test to determine a motion for a new trial on an exculpatory evidence theoiy: is there a substantial risk that the jury would have reached a different conclusion if the evidence had been admitted at trial? The court went on to say:
The test is substantially the same as the Saferian ineffective assistance of counsel standard: “whether [defense counsel’s omission] has likely deprived the defendant of an otherwise available, substantial ground of defense.”
Or, restated again, is there a substantial chance the jury might have reached verdicts of not guilty had the undisclosed evidence been introduced and admitted? No new trial is granted if the undisclosed evidence is cumulative, lacking in credibility, not strong in support of the defendant. A new trial is granted, however, where the
undisclosed evidence is more credible than any other evidence on the same factual issue and bears directly on a crucial issue before the jury, such as the credibility of an important prosecution witness, that evidence would have been a real factor in the jury’s deliberations, and its presence before the jury might have accomplished something material for the defense.
Id. at 414.
The test therefore requires a detailed examination of the undisclosed evidence to ask whether the evidence is exculpatory or just “empty”: evidence which, if admitted, leads only to fruitless reasoning or lines of questioning. Commonwealth v. Satterfield, 373 Mass. 109, 115 (1977).
The record reveals that the defendant specifically requested the tests used by the government’s expert witnesses in formulating their expert opinions, which would logically include the crucial information contained in Sloane’s notes concerned the five negative GC-MS tests. Since possession or custody of Brady material by crime laboratories that act as agents for the Commonwealth is imputed to the Commonwealth, the Commonwealth had an affirmative duty once the request was received to ensure that the defense received all test results, notes and scientific data related *305 to the investigation that lay within the custody and control of the laboratories. See, e.g.: Commonwealth v. Matthews, 10 Mass.App.Ct. 888 (1980); Commonwealth v. Daye, 411 Mass. 719, 734 (1992). Since the defense request should have also led to the discoveiy of the fact that some of the samples tested by Sloan contained pure embalming fluid, the Commonwealth’s failure to facilitate full disclosure becomes even more prejudicial to defendant.
The Commonwealth’s duty to disclose exculpatoiy evidence to the defense includes the duty to make such disclosure on a timely basis. Commonwealth v. Gregory, 401 Mass. 437 (1988); Commonwealth v. Shipps, 399 Mass. 820 (1987). The Commonwealth’s failure to present Sloan’s notes to the defense until a hearing on post-conviction relief is grossly untimely. This is not a case where “the reports were eventually disclosed at an early enough date to permit the defendant to receive a fair trial, even though not disclosed prior to trial.” United States v. Hemmer, 561 F.Sup. 386 (D.Mass. 1983), cert. denied 467 U.S. 1218.
The undisclosed evidence could have been used to discredit the testimony of one of the Commonwealth’s two toxicology experts. As such, it was clearly material. In People v. Drake, 64 Mich.App. 671, 681 (1975), the Court of Appeals of Michigan stated that a new trial was mandatory where the prosecution failed to send to the defense results of an analysis of the decedent’s blood and urine that were exculpatory. The court stated that the failure to produce
the evidence is “material” inasmuch as it relates directly to the conflict between the parties’ theories concerning the cause of decedent’s death.
Id. at 681.
The fact that Sloan testified that he had been unable to positively confirm the screening test results did not cure the failure of the Commonwealth to provide his notes to the defense. His admission is much less significant than the testing that actually took place, which resulted in five negative confirmatoiy LSD test results. The Commonwealth’s lapse deprived defense counsel of the opportunity to use the evidence of the five negative tests in preparing and investigating its case. Commonwealth v. Vaughn, 32 Mass.App.Ct. 435, 439 (1992). The combined effect of the Commonwealth’s failure to timely disclose this evidence combined with defense counsel’s failure to present a competent rebuttal of the prosecution’s case for cause-of-death warrants the order of a new trial for this defendant.
ORDER
For the foregoing reasons, the defendant’s motion for a new trial will be ALLOWED.

 Carey, J., has retired, the undersigned Justice was assigned to hear and decide this motion.

 The defendant filed a Notice of Appeal with the Supreme Judicial Court on November 20, 1992. The Supreme Judicial Court remanded the case to this court and stayed the appellate process pending consideration by this court of this motion.

 Pape has a PhD in toxicology and many years of experience.

 Benjamin is a medical doctor with PhDs in clinical pharmacology and forensic toxicology.

 Carleston is the Chief of Cardiology at Memorial Hospital in Rhode Island and head of the Cardiology Department at Brown University Medical School.

 Hebard is a forensic analytic chemist who works at the Commonwealth’s Crime Laboratory.

 Further information on the history of the GC-MS test is contained in Jones v. State, 716 S.W.2d 142, 148-150 (1986) (GC-MS test had found “general acceptance” in the scientific community pursuant to Frye v. United States, 293 F. 1013 (D.C.Cir. 1923)).

 Hoffman-LaRoche recommend that a confirmatory test, such as the GC-MS test or HPLC test be used to confirm a positive RIA test. Hoffman-LaRoche labeled the GC-MS test as the preferred test for confirmation. Additionally, Dr. Louis Amorusso stated in his trial testimony that the recommended practice among toxicologists, after reaching a positive screening test, is to subject the samples to a confirmatory test.

 The rationale for this analysis being that a positive result on an initial RIA test that cannot be confirmed by a subsequent GC-MS or HPLC test indicates the presence of a cross-reactant rather than the target drug.

 I accept Pape’s and Benjamin’s testimony that, since the deceased’s body was buried for 31 days, the free-standing water in the casket and the embalming fluids could have contaminated the natural bodily fluids that were later sampled for the purpose of forensic testing.

 Hebard conceded that HPTLC was an old method of testing, and mentioned that he had never seen it applied to samples taken from a decomposing body.

 The GC-MS test is described by Greenblatt, supra at 655, as the “gold standard” [for accuracy and reliability] in analytic chemistry.

 The GC-MS and HPLC tests, however, can produce false positives in the unlikely event they encounter a substance which has an identical “retention time” (the time in which it is retained by liquid or gaseous media) to that of the target substance. Greenblatt, supra at 656.

 Diphenhydramine can also cause tachycardia: see infra

 The idea that LSD is occasionally substituted for mescaline was supported at trial by the testimony of Ali Mustafa, the man from whom the mescaline was originally purchased. Mustafa could not, however, state with certainty whether the actual substance he and Praymer sold Martin and Teasha was mescaline or LSD.

 Amorusso did not specify in his report which screening tests he had used. However, I accept Pape’s testimony that standard practice among toxicologists is to refer to the RIA and EMIT tests when using the term “screening test.”

 Amorusso testified on direct examination at trial that another laboratory had run a confirmatory GC-MS test on the samples and detected the presence of LSD. However, there appears to be no basis in the evidence admitted at trial to support his assertion. The assertion was not challenged by the defendant’s trial counsel.

 This report was not admitted into evidence at trial for the reason that it constituted inadmissible hearsay. It is discussed here as the contents of the report may have been the basis for Amorusso’s testimony at trial.

 I accept the testimony of Pape that the embalming fluids sent to NMS by Dr. Wiener, the physician conducting the *306 autopsy of the deceased’s corpse, were clean samples of these fluids and not samples drawn from the actual corpse. This fact was conceded during the hearing on this motion by the Commonwealth’s witness, Hebard.

 Possibly due to the presence of formaldehyde, a cross-reactant with LSD, within the embalming fluids. See supra for discussion of inaccuracies in the RIA test caused by cross-reactants.

 Sloan testified at trial that he had sent the samples to another laboratory for confirmatory GC-MS testing. He did not reveal the results and was not asked by the defendant’s attorney to do so. Although Sloan did reveal that one test had been unsuccessful, the fact that Sloan made Jive unsuccessful attempts to confirm the presence of LSD through GC-MS testing was never revealed to the defense before or during trial. This fact became apparent when Sloan’s notes were found by the Commonwealth one day before Hebard testified at the hearing on this motion.

 The trial judge ruled the NMS report inadmissible after Amorusso finished his testimony.

 An expert treatise identifies increased heart rate as a common side-effect of LSD in question. Winek, supra at 31-50.

 Defendant’s trial counsel cross-examined both Dr. Wei-ner and Dr. Sagall on this point. At trial, Weiner and Sagall admitted that they were not aware of prior deaths caused exclusively by LSD toxicity. Instead, Weiner and Sagall stated that the side-effects of LSD caused Alfredo’s death because his heart condition made him especially vulnerable to LSD-induced tachycardia.

 Dr. Carleston indicated significant additional blockage likely occurred from 1975-1990 although he would not quantify to what extent.

 Benjamin also testified that stress or physical exertion can also cause tachycardia.

 It is possible for LSD to cause an intoxicated person to feel extreme anxiety or highly energetic euphoria, emotional states that have as a natural component a rapid heartbeat. Winek, supra at 31-48. Thus it is equally possible that Alfredo’s increased heart rate was a function of either the physiological or emotional effects of LSD intoxication.

 The court will not reach the defendant’s argument that her trial attorney could not effectively represent her because he was taking the prescription medication Clonopin. Without further objective evidence that this medication impeded counsel's performance, this fact cannot serve as a proper basis for a new trial. Commonwealth v. Little, 376 Mass. 233, 241 (1978).

 Amorusso stated that:
... If one receives a repeatedly positive result, it is recommended an additional different test be performed on the sample; a test usually called gas chromatography or G.C. mass spec, and we were not capable of doing that test at that time, so when we received positive results by our screening method, radioimmunoassay method, we sent the sample out to another laboratory to have the gas chromatographic aspect of the photometric analysis done. And we received back confirmatory positives on each of those samples.
The factual basis for Amorusso’s comment went unexplained during both direct and cross-examination. No positive confirmatory test results were admitted into evidence beyond this reference in Amorusso’s testimony. No evidence of such testing was presented before the court at the hearing on this motion. While a positive confirmatory HPLC test result was achieved at the NMC laboratory, this result, along with the entire NMC report, was not admitted into evidence at trial.

 Trial counsel did not object to the admissibility of the National Medical Center report, either. The trial judge brought up the hearsay issue sue sponte and excluded the report after hearing the Commonwealth’s argument.

 This case was decided under a standard of review more favorable to defendant than that applicable here: the standard of “whether there was an error in the course of the trial . . . and, if there was, whether that error was likely to have influenced the jury’s conclusion" set out in G.L.c. 278 §33E. Commonwealth v. Parker, supra at 246.

 This case was also decided under the more favorable standard of review mandate by G.L.c. 276 §33E. Commonwealth v. Mello, supra at 393.

 The court explores the actual value of the defense to the defendant infra

 The NMC results themselves were criticized at the hearing on the motion for new trial. It is not reasonable to conclude that, if admitted, they would patch up the Commonwealth’s case with little fuss.

 Sloan stated only that “[he] was not able to confirm the initial screening test that [he] obtained using radioimmuno-assay.”

 The implications of the Commonwealth’s failure to disclose this item of exculpatory evidence are discussed infra

 The alibi theory was that the defendant could not have reached the scene of the crime because pain and injury reduced his mobility.

 The opinion does not state whether trial counsel had contacted the other omitted witnesses.

 Note that death has been proven in homicide cases where the actual cause of death was simply the inducement of fear in the victim. See, e.g., Annotation: Homicide by fright or shock, in 47 ALR 2d. 1072 (1959).

 Although no evidence was presented to show that Martin attempted to disguise her actual identity.

 No Massachusetts appellate case has ever considered the issue of whether proof that the victim’s death was caused by the alleged poison is an essential element of murder.