## COMMONWEALTH *vs.* ANSELMO AVILES.

No. 94-P-2032.

Worcester. March 8, 1996. - May 15, 1996.

Present: ARMSTRONG, KAPLAN, & GILLERMAN, JJ.

*Practice, Criminal,* Assistance of counsel, New trial.

At a hearing on a criminal defendant's motion for a new trial, the defendant sufficiently demonstrated that his trial counsel's failure to call available alibi witnesses and counsel's inadequate preparation for trial prejudiced the defendant by depriving him of a substantial ground of defense: a new trial was required. [443-447]

INDICTMENTS found and returned in the Superior Court Department on October 7, 1988.

After the decision of this court in 31 Mass. App. Ct. 244 (1991), a renewed motion for a new trial was heard by *William H. Welch*, J.

*Conrad W. Fisher* for the defendant.

*Sandra L. Hautanen*, Assistant District Attorney, for the Commonwealth.

GILLERMAN, J. In *Commonwealth* v. *Aviles*, 31 Mass. App. Ct. 244 (1991), we affirmed the convictions for assault with intent to rape, armed assault in a dwelling, and armed burglary, but we remanded the case to the trial judge for an evidentiary hearing on the defendant's motion for a new trial alleging ineffective assistance of counsel. *Id*. at 249. The motion had been denied without a hearing.

After five days of evidentiary hearings, the trial judge issued his memorandum summarizing and evaluating the evidence. He concluded that counsel's performance did not fall measurably below that which might be expected from an ordinary fallible lawyer, and that the defendant was not deprived of a substantial ground of defense. The defendant

filed a timely appeal from the denial of his motion.[1] We reverse.

Returning, briefly, to the first appeal: our review of the supporting papers originally presented to the trial judge brought us to the conclusion that trial counsel's "failure to interview and call material witnesses who were unrelated to the defendant raises a serious question as to the effectiveness of counsel." *Id.* at 247. We were also concerned that counsel, in his closing argument, had failed to argue the facts of the defendant's alibi which he had developed at trial through the defendant and members of his immediate family. That alibi depended in part on the physical injuries suffered by the defendant as the result of an automobile accident in which he was involved on May 8, 1988, eight days before the alleged attempted rape.[2] Instead, the focus of his summation was an attack on the credibility of the alleged victim. *Id.* at 248.

The evidentiary hearings before the judge (who was the trial judge) were devoted largely to the testimony of the persons who had not been called as witnesses at the earlier trial. Chief among the new witnesses was Linda K. Schaetske, a chiropractor who treated the defendant.[3] Dr. Schaetske first saw the defendant on May 12, 1988, four days before the al-

[1] The progress of this case after the first appeal is noteworthy. The case was argued on June 6, 1991, and our decision was released on August 15, 1991. The hearings on the order of remand began January 28, 1993, and continued through February 3, 1993. Timely notice of appeal was filed on July 2, 1993. Notice of the assembly of the record, including transcripts of the hearings, was sent December 8, 1994, and the appeal was entered in this court on December 12, 1994. After four enlargements of time, the defendant's brief, originally due January 21, 1995, was filed on May 26, 1995. The Commonwealth's brief, originally due June 25, 1995, after six enlargements of time, was filed on February 8, 1996. The second appeal was argued in the Appeals Court on March 8, 1996. Meanwhile, the defendant, who was granted a stay of execution by a single justice of the Appeals Court, and then, on appeal, by a single justice of the Supreme Judicial Court, was unable to post the necessary bail, and has been continuously incarcerated since his conviction on February 25, 1989.

[2] The defendant testified that while stopped at a traffic light, the rear end of his vehicle was hit by the vehicle behind him.

[3] In our original opinion it appears that we erroneously referred to Dr. Richard F. Russell as the attending chiropractor when it fact there was merely a report that issued under his name.

leged rape.[4] Her testimony, based upon her notes, included the fact that the defendant was on crutches, and that he "was experiencing neck and back pain due to an automobile accident" on May 8. There was also pain in his right thigh. The defendant told Dr. Schaetske that he had received no treatment at the hospital, that he was using crutches, that the pain was sharp, that he could not walk on his right leg because he was unable to put any weight on his right leg or foot because of the pain. X-rays, ice packs, bedrest, and chiropractic treatments were recommended. The X-rays revealed "a straining in the curvature of the neck . . . [which] usually indicates muscle spasms which often times can be the result of an injury. It also revealed subluxation[5] in his lower back."

The defendant saw Dr. Schaetske again on May 13. Her note of that visit states that "Patient to be out of work seven to ten days." (Apparently this referred to the recommendation of Dr. Schaetske.) She also recalled that the defendant "seemed to be very uncomfortable and in pain."

Dr. Schaetske's next entry is May 16, the date of the assault. Her notes state that the defendant was "no longer using crutches [but his] LB [lower back] and neck [were] sore." Dr. Schaetske's notes of May 18 state that the defendant continued to "complain of neck, back and right leg pain." On May 19, she recorded, "the patient was walking better, but still complains of leg and neck pain." She recalled that the defendant was limping for about two weeks following the accident on May 8 — that she expected that he would have problems for "a couple of weeks from the date of the accident"; that is, until around May 22. It was for that reason that Dr. Schaetske concluded he ought to stay out of work during that period. The visits and treatments by Dr. Schaetske continued from June through September, 1988. The details of those later events need not be recorded here, other than to say that the pain and discomfort was largely episodic rather than continuous, and so too, his return to work was intermit-

---

[4]Prior to his first visit with Dr. Schaetske, the defendant had been seen twice at a local hospital, once on May 8 and once on May 10.

[5]Subluxation: "an incomplete luxation or dislocation; though a relationship is altered, contact between joint surfaces remain." Stedman's Medical Dictionary 1356 (5th Law. ed. 1982). The accompanying diagrams in the dictionary shows a subluxation to be a "partial contact of apposing articular surfaces," in contrast to "a complete loss of contact."

tent. Finally, Dr. Schaetske recalled that the defendant used an interpreter, and she confirmed that she had never been contacted by the defendant's trial counsel.[6]

Additional, unrelated persons who testified at the motion hearing and who could have testified to the physical condition of the defendant at or about the time of the assault, but who were not called as witnesses, included (i) Anthony Caprera, defendant's attorney regarding the accident; he saw the defendant on May 19 and he observed that the defendant "was in obvious pain and he wasn't able to sit, and he stood"; (ii) Paul Mason, the defendant's insurance agent who saw the defendant on May 9, the day after the accident; he observed that the defendant "seemed to be bent over . . . and in pain . . . He could [not] stand up too long"; (iii) Lux Collaso and Jose Morales, each of whom lived in an apartment in the same three-family house as the Aviles family; following the accident, each one observed the defendant either using crutches or limping as he walked; (iv) Jose Rivera who was in the car with the defendant when the accident occurred; he observed that the defendant "was really hurt in the back. He could not walk. He was walking bending over like this."

Of this group of potential witnesses, the failure to interview and call Dr. Schaetske was the most serious omission in the preparation and trial of the case, and the consequences were far-reaching. The strength of the defendant's evidence regarding the alleged disabling consequences of the car accident was, as we shall see, critical to the defendant's alibi. We now recapitulate what trial counsel achieved in that regard.

The only witnesses at the trial who testified to the defendant's physical condition and his whereabouts on May 16th, were the defendant, his father, his mother, and his thirteen year old sister. All of these witnesses testified through an interpreter. On the direct examination of the defendant's

---

[6]Trial counsel testified that he attempted to reach Dr. Schaetske "almost every day for a couple of weeks. When I had no luck I instructed my secretary to call her every day. And finally I told her to tell her if she didn't respond, I would summons her in and she would sit there all day until it got to her." Dr. Schaetske testified on cross-examination that she did not recall that any messages were left from the office of trial counsel; that there were two secretaries and an office manager in her office, and that to the best of her memory, she "never had any communications with an attorney's office relative to Anselmo Aviles." It appears from the text of the judge's memorandum of decision that he credited the testimony of Dr. Schaetske.

family,[7] the trial attorney briefly attempted to establish that the defendant was on crutches continuously until around May 22, and that he was continuously at home from the date of the accident to around May 22. The father and mother stood firm on cross-examination, but the sister wavered under a cross-examination which focused on her uncertainty about dates and her uncertainty as to whether the defendant "could have gone out" more than once between May 8 and May 21.

The direct examination of the defendant revealed, at the very least, a grossly inadequate preparation of the witness. Through his interpreter, the defendant said that a doctor at the hospital told him he had "pinched nerves," but that another doctor told him "[t]hat my neck and my hip were fractured," and that he should put "ice bags on them[,] to lie down, to rest."[8] During the period between May 10 and May 21 the defendant never went anywhere where he didn't need the crutches and during that period he went to see the doctor "every day." After a few more questions about his being photographed at the police station, his having gone to Puerto Rico on May 24 for a brief visit, and his arrest, the direct examination ended. The defendant was never asked whether he was involved in the assault of May 16; he was never asked to describe the course of his recovery from the automobile accident; and he was never asked his whereabouts on May 16. On cross-examination, he was asked the name of the doctor who told him that his neck and hip were fractured; the defendant testified, "I don't remember her name because it's in English and I don't remember." The prosecutor asked the defendant where he was on the night of the 16th; the defendant said he was home watching the Spanish station on television. There was no redirect examination of the defendant, and there was no additional evidence presented by the defendant regarding his alibi, or the diagnosis, treatment, or symptoms of the defendant's alleged injuries.

[7]The direct examination of the father occupies five pages of the transcript; that of the mother occupies three and one-half pages; that of the thirteen year old sister, occupies three pages.

[8]As noted earlier, the treatment of ice packs and bedrest was recommended by Dr. Schaetske, and presumably it was she to whom the defendant was referring as the second "doctor." Nothing in the record has been brought to our attention which indicates that the defendant's neck and hip were fractured — or that the remedy of ice packs and bedrest were the preferred treatments for those injuries.

In his opening statement, trial counsel told the jury that the defendant's evidence "will be mainly, first of all, evidence of an alibi," and that on May 8, 1988, the defendant "was involved in an automobile accident — a very serious automobile accident in which he had a dislocated hip, there may have been fractures involved. As a result of that accident, he went to the hospital . . . and was given crutches. He had those crutches . . . from May 8th to May 21st." In his closing argument to the jury, trial counsel made no mention of the alibi, the automobile accident, or the defendant's alleged injuries.

In his memorandum following the evidentiary hearings on the motion for a new trial, the judge concluded that "evidence relative to the crutches and the chiropractic treatment would have been contradicted at best, and would not have proved the defendant could not walk. . . . Even if the defendant had a leg injury it would not have been strong or convincing evidence that the defendant could not have committed the assault."

In our view, the judge misperceived the contribution that could have been made by Dr. Schaetske's testimony. The issue was not whether the defendant's physical condition prevented him from committing a violent assault, but whether his condition explained his continuous presence either in his house or in the immediate area surrounding the house, except for obvious events, such as the appointments with Dr. Schaetske. It was in that connection that the X-ray taken by Dr. Schaetske was of critical importance. Unlike the X-ray taken at the hospital (which, as the judge noted, indicated that the hip joints were normal), the X-ray taken by Dr. Schaetske showed, as we have said, a straining in the curvature of the neck and a subluxation, or dislocation, in his lower back. Those conditions — which called for a careful description and explanation by Dr. Schaetske — prompted her to conclude that the defendant's leg and neck pain, and his difficulty with walking, would continue for several weeks, that is, until around May 22. Only Dr. Schaetske was in the position of being able to substantiate, with the objective evidence of an X-ray, exactly what the physical condition of the defendant was following his accident, and only Dr. Schaetske could testify authoritatively regarding the alleged need of the defendant to remain at home, with ice packs and bedrest,

until around May 22. The omission of Dr. Schaetske's testimony and the testimony of Attorney Caprera, Paul Mason, Lux Collaso, Jose Morales, and Jose Rivera, all of whom saw the defendant's disabling condition after the accident, left the defendant, for no sound tactical reason or explanation, with the supporting testimony of only his father, mother, and sister.

Worse still, it left the defendant's own testimony — that he had suffered a fractured neck and hip which would be cured with ice packs and bedrest — in a posture that lacked credibility.[9] There is little wonder that trial counsel concluded that the "alleged alibi . . . had its problems," and, therefore, he jettisoned the alibi[10] in favor of his attempt to persuade the jury in his closing argument that the victim told the story she did because "she's seeking attention, she could be having marital problems, she could be [*sic*] — mental problem. I don't know" — this, in spite of the fact that he admitted at the hearing on the motion that he had no basis for these statements; it was merely his "intuition." This attempt to persuade the jury that the alleged attempted rape never happened was overwhelmed by the Commonwealth's evidence that the police observed evidence of a forceful entry into the victim's house, and by the several, detailed fresh complaint statements given by the victim to the police, one immediately after the episode and the other the following day.

To these obvious difficulties, we add that at the time of the trial, which was about eight months after the assault, the defendant was twenty-three. He testified on cross-examination the he had arrived in the "Southbridge area" five years earlier, and so between the ages of eighteen and twenty-three he had never been arrested or charged with any crime by the local police. Yet the record is barren of any evidence of the man's

---

[9]Obviously Dr. Schaetske's observation that the defendant was not using crutches when Dr. Schaetske saw him on May 16 contradicts the testimony of the family regarding the defendant's need for crutches continuously until around May 22. But that suggests there was a failure of trial counsel to determine the facts and to confront the defendant and the family with those facts.

[10]In his closing argument, the prosecutor commented on the absence of any reference to an alibi in the defendant's closing argument.

life or character,[11] even from the members of his own family
— a remarkable omission given the sudden, violent, and
deliberately cruel assault upon the victim.[12] When placed in
the context of the victim's vulnerable identification of the de-
fendant, see *Commonwealth* v. *Aviles*, 31 Mass. App. Ct. at
245, character evidence (if only from the defendant) could
have had a substantial impact. The cumulative effect of these
omissions regarding available witnesses and the defendant's
history and character, as well as the errors in closing argu-
ment, probably deprived the defendant of his alibi defense.

We conclude that the defendant has made a sufficient
"showing that better work [by trial counsel] might have ac-
complished something material for the defense," *Com-
monwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977), see also
*Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974), and that
the probable effect of counsel's inadequate preparation of this
case for trial was prejudicial to the defendant by depriving
him of a substantial ground of defense. *Id*. at 98.

There must be a new trial.

*So ordered.*

---

[11]It was the prosecutor, on cross-examination, who brought out that dur-
ing his five years in the Southbridge area he worked as "machine assis-
tant."

[12]See *Commonwealth* v. *Aviles*, 31 Mass. App. Ct. at 244, for a descrip-
tion of the assault.