## COMMONWEALTH *vs.* HASSAN THOMAS.

Suffolk. January 5, 1999. - March 5, 1999.

Present: WILKINS, C.J., ABRAMS, GREANEY, FRIED, & IRELAND, JJ.

*Practice, Criminal,* Instructions to jury, Comment by prosecutor, Witness, Presumptions and burden of proof, Mistrial, Argument by prosecutor, Capital case. *Witness,* Unavailability. *Evidence,* Absence of witness, Failure to produce evidence, Inference, Spontaneous utterance, Relevancy and materiality, Prior consistent statement, Hearsay. *Due Process of Law,* Inference, Burden of proof, Fair trial. *Homicide.*

At the trial of a murder indictment, there was no error in the prosecutor's reference in closing argument to the defendant's failure to call a named person as a witness, nor was there error in the judge's corresponding jury instruction on the missing witness, where there was a sufficient foundation in the evidence to permit the adverse inference. [149-153]

There was no merit to a criminal defendant's claim that a missing witness instruction and the prosecutor's comments on the defendant's failure to call a witness eroded the presumption of the defendant's innocence. [153-154]

At the trial of a murder case, the judge correctly ruled that the evidence presented at trial was insufficient to warrant an instruction on voluntary manslaughter. [154-155]

In a murder case, there was no merit to the defendant's claim that the prosecutor improperly appealed to the sympathy of the jury by referring, in his opening statement, to the presence of the victim's family in the courtroom and, later, by calling the victim's aunt as a witness [155-157]; nor did any statements in the prosecutor's opening remarks, referring to inadmissible hearsay, prejudice the defendant, in light of the judge's immediate curative instructions and in circumstances in which the reference was, in any event, merely cumulative [157-158].

At the trial of a murder case, certain hearsay testimony, consisting of an answer to one question on direct examination of a witness, was so minimal as to be nonprejudicial. [158-159]

At a criminal trial, a police officer's testimony, recounting a witness's out-of-court identification of the defendant, was properly admissible. [159]

At a criminal trial, admission of certain hearsay evidence was improper but not prejudicial, where the evidence was merely cumulative. [159-160]

At a murder trial, the judge properly admitted certain testimony under the excited utterance exception to the rule against hearsay [160]; further, certain other evidence consisting of out-of-court statements was not inadmissible hearsay, where it was not offered for the truth of the matters stated [160-161]; and, finally, evidence of another out-of-court statement

was properly admitted, not for its truth, but to rebut a claim of recent fabrication [161-162].

INDICTMENT found and returned in the Superior Court Department on February 29, 1996.

The case was tried before *David M. Roseman,* J.

*Willie J. Davis* for the defendant.

*Amanda Lovell,* Assistant District Attorney (*Robert N. Tochka,* Assistant District Attorney, with her) for the Commonwealth.

FRIED, J. The defendant, Hassan Thomas, was convicted of murder in the first degree by reason of deliberate premeditation for the shooting death of Moses Grant. He appeals from the judgment of the Superior Court. We affirm the judgment of conviction.

I

On February 19, 1996, just before 2 P.M., Moses Grant was driving his aunt's vehicle on Stanwood Street in the Grove Hall area of the Roxbury section of Boston, when he stopped the vehicle to speak with two acquaintances, Jason Bly and Curtis Mikell. Both young men got into the vehicle, and Grant proceeded to drive in the direction of Blue Hill Avenue. Moments later, Mikell saw a man in a green coat in the street ahead of the vehicle and stated, "That looks like Biscuit." At about the same time, Mikell and Bly each witnessed the man in the green coat reach behind his back and pull out a gun. Mikell told everyone to duck and told Grant to put the car in reverse. Grant, however, continued to drive toward Blue Hill Avenue as the occupants of the car ducked down in their seats. As the vehicle passed the man in the green coat, he fired one shot through the rear left window of the vehicle, striking Grant in the back of the head. Grant then lost control of the vehicle and it crashed into a fence. Immediately after the shooting, Mikell and Bly got out of the vehicle. Mikell began to run down the street because he was afraid he would be shot too, but, after taking only a few steps, he returned to check on Grant. Mikell told Bly to talk to Grant, who was bleeding and moaning, while he called the police. Bly stayed with Grant until the police arrived.

At trial, both Bly and Mikell testified that they were certain that the man in the green coat, whom Mikell had identified as

"Biscuit," was the defendant, Hassan Thomas. Both Mikell and Bly were acquainted with the defendant prior to the shooting. Immediately after the shooting, however, neither Mikell nor Bly identified the defendant to the police as the shooter. Mikell did not immediately speak to the police at all, but went to the nearby house of an adult friend, Raymond Caldwell, to whom he identified the defendant as the person who had shot Grant. Bly spoke to the police at the scene, giving a physical description of the shooter, but did not name the defendant. Bly also went to Caldwell's home after leaving the scene, but did not identify the defendant to Caldwell.

Another eyewitness to the shooting, Lanice Mikell, Curtis Mikell's uncle, testified that he saw the defendant in the street, and had begun to cross the street with his hand outstretched to greet the defendant, when he saw the defendant pull a gun from behind his back and fire at an approaching vehicle. Lanice testified that, as he crossed the street toward the defendant, the defendant was watching the vehicle approach and did not look toward Lanice or respond to his greeting, and that the defendant ran down the street after the shooting occurred. Lanice then saw his nephew, Curtis, get out of the vehicle. He shouted to Curtis, demanding to know what he was doing on Stanwood Street, and told him to go home. Curtis responded that he could not leave because his friend had been shot. Lanice testified that he did not speak to the police on the day of the shooting, but immediately went to his brother's house and remained there for two weeks because he was afraid to leave.

After leaving Caldwell's home, Curtis Mikell returned to his own home, where he told his aunt, Janice Hatcher, what he had seen. He mentioned the identity of the shooter and the fact that Lanice Mikell had been present at the shooting. That same evening, the victim's uncle, Willie Grant, a Boston police detective who was acquainted with Curtis's family, came to Curtis's home and urged him to tell the police what he had seen. Curtis then went to the police station with Detective Grant and made a statement identifying the defendant as the shooter. He did not, however, inform the police that Lanice had witnessed the shooting, because Lanice did not want his name associated with the incident.

Later that evening, Sergeant O'Leary and Detective Martel of the Boston police department went to the defendant's home and spoke with the defendant in his bedroom, where they arrested

him. After being taken to the police station and informed of his Miranda rights, the defendant told the police that he had been away from home from noon until approximately 2 P.M. that day. He then changed his mind, saying he had returned home at 1 P.M., and then stated that he did not remember what time he had returned home.

At trial, the defendant's mother and grandmother each testified on his behalf. His mother testified that he had returned home around 1 P.M. on the afternoon of the shooting. She saw him go to the basement and did not see him leave until she paged him later that afternoon after she heard that Grant had been shot, and he came up from the basement. The defendant's grandmother testified that she was also in the house when the defendant returned home sometime between 12:30 and 1:30 P.M. Both testified that Ellison Joseph, a friend of the defendant's mother, was in the kitchen of the apartment at the time the defendant entered the house.

## II

The defendant's primary argument on appeal is that his right to due process was violated by a missing witness instruction[1] given to the jury and by a remark, made during the prosecutor's

---

[1]The judge instructed the jury as follows:

"[D]uring the course of the trial, you have heard testimony which referred to a potential witness, and that witness's name was . . . Ellison Joseph. So you have heard testimony which referred to Mr. Joseph. However, he did not testify before you.

"Now, as I have instructed you, the general rule is that in reaching a verdict, you may only consider evidence that was presented to you in court. However, under certain circumstances, you also may consider the fact that a potential witness did not testify. So, where a party has knowledge of a person who can be located and brought forward who is friendly to or at least not hostilely disposed toward the party and who can be expected to give testimony of distinct importance to the case, the party naturally would offer that person as a witness. If, then, without explanation that party is not so offered, you are free to but not required to infer that witness, had he been called, would have given testimony unfavorable to that party.

"The proper foundation for the inference will exist only if four conditions are satisfied. Number one, the government's case against the defendant must be so strong that, if innocent, he would be expected to call the witness; number two, the absent witness must be expected to offer important testimony supporting a defendant's position; third, the absent witness must be available to testify for the particular party; and, fourth, the witness's absence must not

closing statement, referring to the defendant's failure to call Ellison Joseph as a witness. This remark by the prosecutor and the corresponding jury instruction were not improper.

In his opening statement, defense counsel told the jury that they would hear from several witnesses who would testify that the defendant had been at home at the time the murder occurred. One of these individuals, he told the jury, was Ellison Joseph. Defense counsel stated: "[T]here will be testimony from a Mr. Ellison Joseph. . . . Mr. Joseph is a friend of the defendant's mother. [H]e too was present when the defendant came in. Now he does not know what time the defendant came in either but he can tell you that he left there sometime around one or shortly thereafter and that the defendant was there when he left." Despite this statement, the defendant did not call Joseph to testify during the trial. The defendant relied instead on the testimony of his mother and grandmother, who were also at the defendant's home around the time of the murder.

Where a defendant has knowledge of an available witness whose general disposition toward the defendant is friendly, or at least not hostile, and who could be expected to give testimony of distinct importance to the defendant's case, but the defendant, without explanation, fails to call that witness, the jury may permissibly infer that that witness would have given testimony detrimental to the defendant's case. See *Commonwealth* v. *Keniston*, 423 Mass. 304, 314 (1996), quoting *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. 130, 134 (1986). The strength of the case against the defendant, whether the defendant would be expected to call the witness if the defendant were innocent, and the importance of the witness's likely testimony to the defense are important considerations in determining whether an adverse inference based on the defendant's failure to call a certain witness is appropriate. See *Commonwealth* v. *Olszewski*, 416 Mass. 707, 724 (1993), cert. denied, 513 U.S. 835 (1994). Where a witness's testimony would have been merely cumulative or

be explained by any of the other circumstances in the case.

"So, if all four conditions have been met, that is, you are satisfied beyond reasonable doubt that they have been met, you are permitted to draw an inference that that witness's testimony would not have been favorable to the particular party if you find beyond reasonable doubt that to be a reasonable conclusion in light of all the circumstances in the case.

"If any of the four conditions have not been met, you may not draw such an inference and you shall completely disregard the potential witness's testimony as a factor in this case."

unimportant, there is no basis for such an inference. See *Keniston, supra* at 314; *Schatvet, supra* at 134.

Whether the adverse inference is permissible depends on the facts of each case, see *Commonwealth* v. *Richardson, post* 182 (1999); *Commonwealth* v. *Franklin*, 366 Mass. 284, 292 (1974) ("[n]o case purports to state those conditions required as a minimum before the inference is permissible"), and whether to give a missing witness instruction is a decision that must be made on a case-by-case basis, in the discretion of the trial judge. See *Commonwealth* v. *Graves*, 35 Mass. App. Ct. 76, 81 (1993). That decision will be overturned on appeal only if it was "manifestly unreasonable." *Id.* at 86.

In this case, the judge did not abuse his discretion in permitting the Commonwealth to comment on the defendant's failure to call Ellison Joseph as a witness and in providing a missing witness instruction to the jury. The record reflects that Ellison Joseph was known to the defendant and was available to testify at trial. He was present at or outside the courthouse on at least two of the days of trial, and defense counsel stated to the judge that he had spoken with Joseph at the courthouse on at least one of those days. Joseph's availability to the defense favors the permissibility of the prosecutor's comments. See *Commonwealth* v. *Niziolek*, 380 Mass. 513, 518 (1980). Moreover, the defendant had "superior knowledge of the identity of the witness[] and [his] whereabouts." *Graves, supra* at 83. This knowledge is another "important factor" favoring the permissibility of the missing witness inference. *Id.* The fact that the Commonwealth itself could have called Joseph as a witness does not render the adverse inference impermissible, because the defendant was more closely acquainted with Joseph and would "be naturally expected to call" Joseph in light of the facts of the case. *Niziolek, supra* at 519. Cf. *Franklin, supra* at 293 (even where witness equally available to both parties, inference against defendant may be permissible).

Further, Joseph was "friendly to, or at least not hostilely disposed toward," the defendant. *Keniston, supra* at 314. According to the defendant's mother's testimony, she and Joseph had been acquainted for eight years at the time of trial. They had been in a dating relationship in the past and, even though they were no longer dating at the time of trial, Joseph occasionally drove her home from work in the period leading up to the trial, and she and Joseph remained friends at the time of trial. It

might be said that a friendly disposition toward the defendant's mother does not necessarily imply a similar disposition toward the defendant, but there is no evidence in the record that Joseph harbored any hostility toward the defendant, nor does the defendant offer on appeal any reason to believe such hostility existed.

The strength of the Commonwealth's case provides further cause for permitting the inference. The stronger the prosecution's case, the stronger the expectation that the defendant would call the available witness if the defendant were innocent. See *Olszewski, supra* at 724 (whether defendant would be expected to call witness if he were innocent "must" be considered before prosecutor may comment on defendant's failure to call witness). Here, the prosecution called three eyewitnesses, all of whom had been personally acquainted with the defendant prior to the shooting, and all of whom testified that they were certain that the shooter was the defendant. In similar circumstances, the Appeals Court held that the Commonwealth's case was "strong" and, therefore, that the missing witness inference was permissible. See *Graves, supra* at 82 (Commonwealth offered two witnesses who had previously known defendant and who unequivocally identified defendant as rapist).

Moreover, Joseph could have been expected to offer testimony of "distinct importance" to the defendant's case, and not merely evidence that was cumulative or unimportant. According to the testimony of the defendant's mother and grandmother, Joseph was in an excellent position to observe the whereabouts of the defendant in the hours just before the murder occurred. The defendant's mother testified that Joseph was present in the apartment from noon until roughly 2 P.M. She testified that Joseph was present when the defendant came home and that Joseph spoke to the defendant as the defendant entered the apartment. The defendant's grandmother testified that Joseph arrived at the apartment around noon and sat down in the kitchen, adjacent to the door to the basement where the defendant claimed to have been when the murder occurred. The testimony that Joseph could have provided could not be duplicated by the defendant's mother or grandmother, who were seated in the living room and another bedroom, respectively, from which the door to the basement was not visible. The defendant's mother specifically testified that, from where she was seated, she was unable to see the door to the basement or to the defendant's bedroom. Joseph,

who was seated at the kitchen table near the basement doorway, could have testified as to whether the defendant left the basement, where he claimed to have been at the time of the murder, during the period that Joseph was inside the apartment. Thus, Joseph's testimony would not have been merely cumulative.

Joseph's potential testimony cannot be considered cumulative for the further reason that he is not a relative of the defendant, whereas all other alibi witnesses called by the defendant are members of the defendant's family. Common sense and the case law dictate that the testimony of a blood relative of the defendant is inherently less credible than the testimony of other witnesses. Cf. *Commonwealth* v. *Aviles*, 40 Mass. App. Ct. 440, 446 (1996); *Commonwealth* v. *Brookins*, 33 Mass. App. Ct. 626, 632 (1992), *S.C.*, 416 Mass. 97 (1993).

Finally, the defendant is in a particularly weak position to argue that the failure to call Joseph should not be taken to reflect on the importance of the evidence Joseph might have given, as defense counsel himself in his opening stated that Joseph would offer testimony corroborating that of the defendant's mother and grandmother.

The defendant argues on appeal that Joseph's testimony is unimportant because Joseph would have testified only that he was in the apartment until roughly 1 P.M., and, therefore, could not have provided a complete corroboration to the defendant's alibi of being in the apartment until 2 P.M., when the shooting occurred.[2] But the testimony that would be expected of a witness need not provide full corroboration of an alibi in order for the absence of that witness to result in a permissible inference adverse to the defendant. See *Commonwealth* v. *Caldwell*, 36 Mass. App. Ct. 570, 582, *S.C.*, 418 Mass. 777 (1994).

In light of all these factors, an inference that Joseph, if he had been called to testify, would have given testimony adverse to the defendant was permissible. Therefore, the judge did not abuse his discretion by permitting the prosecutor to comment on the defendant's failure to call Joseph nor by providing a missing witness instruction to the jury.

The defendant argues further that the missing witness instruction and the prosecutor's comments on the defendant's failure

[2]The record does not necessarily support the assertion that this is what Joseph would have testified. The defendant's mother testified that Joseph was inside the apartment until 2 P.M.

to call a witness eroded the presumption of the innocence of the defendant, despite the judge's instruction on that presumption and the Commonwealth's burden of proof beyond a reasonable doubt. This argument is without merit.

In *Commonwealth* v. *Niziolek, supra,* the defendant made the similar claim that the prosecution's comment regarding the defendant's failure to call a certain witness unconstitutionally shifted the burden of proof to the defendant. This court rejected that claim, stating: "The adverse inference in no way shifts [the burden of proof to the defendant]. . . . 'The possibility of such an inference being drawn does not impose an unconstitutional burden upon a defendant. The State still bears the burden of persuasion beyond a reasonable doubt. The fact finder need not draw the permitted factual inference.' " *Id.* at 522, quoting *Gilbert* v. *State,* 36 Md. App. 196, 208 (1977). In *Commonwealth* v. *Happnie,* 3 Mass. App. Ct. 193, 195 (1975), the Appeals Court stated that the defendant's failure to call certain witnesses in similar circumstances "is fair matter for comment, and is not within the protection of the Constitution." The prosecutor's comments and the judge's instruction in no way encouraged the jury to presume the guilt of the defendant. They only provided the jury with the option of drawing a certain factual inference if they found that the evidence warranted it. Moreover, the judge's numerous instructions on the presumption of innocence and the Commonwealth's burden of proof beyond a reasonable doubt remove any concern that the jury may have been unaware of that presumption.[3] See *Graves, supra* at 86-87. There was no constitutional error.

### III

The defendant argues that the judge erred in denying the defendant's request that the jury be instructed on manslaughter. Although an alibi defense was the primary theory asserted by the defendant throughout the trial, defense counsel urged the judge to instruct on manslaughter on the theory that, even if the shooter had been the defendant, the jury might reasonably infer

---

[3]The judge instructed the jury on the presumption of innocence at least twice before the parties' opening statements and again at the close of trial. He instructed the jury on the burden of proof beyond a reasonable doubt before opening statements and at least six times at the close of the trial. The jury were also instructed, before opening statements and at least three times at the close of trial, that the defendant need not produce any evidence whatsoever.

that the shooter's actions were reasonably provoked by a situation in which an unrecognized vehicle bore down on him as he stood in the street.

The law states, as the defendant points out, that where the evidence would create a reasonable doubt whether the defendant was reasonably provoked, a manslaughter instruction must be given. *Commonwealth* v. *Fryar*, 425 Mass. 237, 249, cert. denied, 522 U.S. 1033 (1997), quoting *Commonwealth* v. *Pierce*, 419 Mass. 28, 33 (1994) ("An instruction on involuntary manslaughter is required where any view of the evidence will permit a finding of manslaughter and not murder"). See *Commonwealth* v. *Sires*, 413 Mass. 292, 301 (1992). It is also true, however, that where the evidence would support no such finding by the jury, the failure to give such an instruction cannot be error. See *Commonwealth* v. *Seabrooks*, 425 Mass. 507, 514-515 (1997).

"A jury instruction on voluntary manslaughter is warranted 'if there is evidence of provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool.' " *Seabrooks, supra* at 514, quoting *Commonwealth* v. *Schnopps*, 383 Mass. 178, 180 (1981), *S.C.*, 390 Mass. 722 (1984). No such instruction need be given unless a jury might infer that a reasonable person would have been sufficiently provoked in the circumstances and that the defendant was in fact provoked. See *id.*, quoting *Pierce, supra* at 31.

A reading of the entire record reveals that the judge was justified in ruling that the evidence presented at trial was insufficient to warrant a voluntary manslaughter instruction. The evidence showed that the shooter stood in the street and watched the vehicle as it approached him; there is no evidence that the vehicle came on him suddenly, that he could not have stepped onto the sidewalk, or that the vehicle was driven in a menacing fashion. Based on the evidence presented, viewed in the light most favorable to the defendant, nothing in the manner in which the vehicle was driven nor in the attendant circumstances would have provoked a reasonable person to fire at the vehicle.

IV

The defendant argues that the prosecutor improperly appealed to the jurors' sympathy by referring, during his opening state-

ment, to the presence of the victim's family in the courtroom and, later, by calling the victim's aunt as a witness. This argument is without merit.

The allegedly improper opening reference to the victim's family consisted merely of part of one sentence in a lengthy opening statement. The prosecutor stated: "You will hear from Moses Grant's family, *who sits in the front row here*, and you will hear that Stanwood Street was a very tight-knit group of individuals, a group of young men" (emphasis added). The prosecutor was entitled to state that the jury would hear from the victim's family, because the prosecutor intended to call the victim's aunt as a witness. See *Commonwealth* v. *Breese*, 381 Mass. 13 (1980) (counsel may state anything in opening that he intends to prove by evidence). Therefore, the only possible impropriety was the comment that the defendant's family sat in the front row. Even if this comment had some potential to arouse sympathy in the minds of the jury — a doubtful proposition — it would not constitute grounds for a new trial because it did not prejudice the defendant. This passing remark, when considered in the context of the entire opening statement and the overwhelming evidence of the defendant's guilt can be said with "fair assurance" to not have "substantially swayed" the judgment of the jury and, therefore, to be nonprejudicial. *Commonwealth* v. *Rosado*, 428 Mass. 76, 79 (1998), quoting *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).[4]

Nor was the calling of the victim's aunt as a witness ground for a new trial. The defendant argues that the victim's aunt was unable to provide any evidence except inadmissible hearsay and that the prosecution's decision to call her as a witness was a "calculated impropriety." But, as in *Commonwealth* v. *Andrews*, 403 Mass. 441, 451 (1988), on which the defendant relies, the prosecution called the witness for a valid purpose — to rebut a

_____

[4]The defendant argues that the prejudice created by this comment was exacerbated by sobbing in the courtroom. There is no evidence, however, that it was members of the victim's family who were sobbing, nor even that the sobbing was occurring at the time the reference to the family was made. There is no reason to believe that the prosecutor referred to the victim's family in order to capitalize on the sobbing. The Commonwealth cannot be expected to control, nor should it be held responsible for, spontaneous outbursts by members of the public during a trial. Cf. *Commonwealth* v. *Andrews*, 403 Mass. 441 (1988) (where victim's mother made an emotional outburst during her testimony, this court held that outburst was not ground for new trial because remark was not "calculated" by prosecution).

claim of recent fabrication on the part of other Commonwealth witnesses. See Part IV, *infra.* There is no reason to believe that the prosecution's decision to call the victim's aunt was calculated to inject unfair prejudice into the trial.

The defendant also argues that his due process rights were violated because the prosecutor's opening referred to several pieces of evidence that could only be proved by the improper admission of hearsay evidence. The defendant objected to these statements at the end of the Commonwealth's opening statement and requested a mistrial. The judge denied the motion for a mistrial, but immediately instructed the jury that statements of counsel are not evidence and should not be considered as such. Despite this curative instruction, the defendant argues on appeal that the prosecutor's statements were so prejudicial that the error was not cured by the instruction and, therefore, require a new trial.

The statements to which the defendant objects referred to the relationship between the defendant and the other young men in his neighborhood prior to the murder. The prosecutor told the jury that they would hear evidence that the defendant had had a fight with Abdul Kabba, after which the defendant's social status went from "bad to worse." He also stated that the evidence would show that the defendant later attacked Kabba and harbored enmity toward the victim as well because of the victim's friendship with Kabba. The defendant claims that no evidence was introduced at trial to support these opening statements, and that no evidence properly could have been admitted.

A trial judge retains broad discretion in deciding whether to declare a mistrial, and this court should defer to that judge's determination of whether the prosecutor committed prejudicial error, how much any such error infected the trial, and whether it was possible to correct that error through instruction to the jury. See *Commonwealth* v. *Olivares*, 30 Mass. App. Ct. 596, 601 (1991); *Commonwealth* v. *Murray*, 22 Mass. App. Ct. 984, 985 (1986). The judge in the instant case did not abuse that discretion. A prosecutor in his opening may explain the facts that he expects to prove during the trial, so long as he has a good faith expectation that he will be able to do so with relevant and admissible evidence. See *id.* at 985; *Commonwealth* v. *Nardi*, 6 Mass. App. Ct. 180 (1978). In *Commonwealth* v. *Nardi, supra,* the prosecutor referred in his opening to evidence that the judge ruled inadmissible later during the trial. Yet, because there was

no evidence that the opening reference to that evidence was made in bad faith, the judge's refusal to declare a mistrial on the basis of the opening statement was properly within the judge's discretion. See *id.* at 186. See also *Commonwealth* v. *Breese*, 381 Mass. 13, 15-16 (1980) (if testimony mentioned in opening "does not materialize, it will not be presumed that the prosecutor acted in bad faith"). The case for deferring to the judge's discretion is even stronger in this case, where the evidence was admitted at trial.

Moreover, a claim of improper argument by the prosecutor must be judged in light of the entire argument, the judge's instructions to the jury, and the evidence actually introduced at trial. See *Commonwealth* v. *Rosa*, 412 Mass. 147, 156 (1992), quoting *Commonwealth* v. *Lamrini*, 392 Mass. 427, 432 (1984). On consideration of these factors in the present case, it is clear that any statements by the prosecutor referring to inadmissible hearsay could not have prejudiced the defendant. First, the judge provided a curative instruction immediately after the prosecution's opening which, we may presume, the jury understood and followed. See *Rosa, supra* at 160. Second, even where a statement has been improperly admitted, a prosecutor's reference to it in opening or closing may not constitute prejudicial error if the evidence was merely cumulative in light of other strong evidence. See *Commonwealth* v. *Wilson*, 427 Mass. 336 (1998); *Commonwealth* v. *Gil*, 393 Mass. 204, 218-219 (1984). In the instant case, even if any of the evidence of the defendant's hostility toward the victim were improperly admitted hearsay, there was so much nonhearsay evidence of this hostility that the prosecutor's reference to any hearsay was cumulative and, therefore, nonprejudicial.[5]

## V

The defendant argues that his due process rights were violated

---

[5]Curtis Mikell testified that he had been present at a fistfight between the defendant and Abdul Kabba and that, after that incident, the defendant ceased to play basketball or keep company with other young men in the neighborhood as frequently as he had in the past — evidence that the defendant's social relationships had worsened. Kevin Phillips, an acquaintance of both the defendant and the victim, testified that he had witnessed an incident in which the defendant and the victim were shooting at each other in the street. Again, this evidence bore out the prosecutor's opening claim that he would show the defendant's hostility toward the victim. The record is replete with other examples of similar testimony.

by the improper admission of hearsay evidence throughout the trial.

The defendant argues that the admission of Detective Thomas O'Leary's testimony about his conversations at the police station with Jason Bly and Detective Grant was error, but he does not specify why that testimony was objectionable. The testimony to which the defendant objects consisted of O'Leary's answer to one question on direct examination, in which he recounted that he had told Grant that they needed to obtain a statement from Bly about Bly's version of events.[6] Testimony that this conversation occurred was not hearsay. The content of that conversation — that a statement from Bly was needed — was hearsay. This testimony was so minimal, however, as to be non-prejudicial. See *Commonwealth* v. *Cormier*, 427 Mass. 446, 449 n.1 (1998); *Commonwealth* v. *Arce*, 426 Mass. 601, 603 (1998); *Commonwealth* v. *Murphy*, 426 Mass. 395 (1998). Therefore, it does not require a new trial.

There was no error in admitting O'Leary's testimony recounting Bly's out-of-court identification of the defendant, which was admissible both as corroboration of Bly's testimony regarding that identification and of Bly's in-court identification of the defendant. See *Commonwealth* v. *Gunter*, 427 Mass. 259 (1998); *Commonwealth* v. *Daye*, 393 Mass. 55 (1984); *Commonwealth* v. *Repoza*, 382 Mass. 119 (1980), *S.C.*, 400 Mass. 516, cert. denied, 484 U.S. 935 (1987); *Commonwealth* v. *Sheeran*, 370 Mass. 82 (1976).

The defendant also objects to the admission of testimony by Kevin Phillips, another youth questioned on the night of the murder, who stated that, while he was being interviewed by O'Leary, O'Leary stated that he did not believe Phillips had committed the murder.[7] Although admission of this statement may have been improper, it was not prejudicial because the testimony was merely cumulative of other evidence that O'Leary

---

[6]O'Leary stated: "I told Willie that we needed a statement from Jason as to his version of events on Monday, that if he could talk to him and tell him that I again wanted to get a statement from him."

[7]Kevin Phillips, who was acquainted with the defendant, the victim, Mikell, and Bly, was dressed similarly to the defendant on the day of the shooting. He had spent approximately two hours with Bly on Stanwood Street in the morning on the day of the shooting. Later that day, after Phillips was informed that Grant had been shot, he went back into the street, where he was stopped and handcuffed by security guards. Boston police officers then took Phillips to the police station for questioning, but Phillips was released within the hour.

in fact did not believe that Phillips had murdered the victim.[8]
See *Cormier, supra* at 449 n.1; *Arce, supra* at 603; *Murphy, supra* at 403.

Curtis Mikell testified about the content of his conversation with his uncle, Lanice Mikell, at the scene of the crime, during which Curtis rejected his uncle's demand to leave the crime scene because his friend had just been shot. This testimony was admissible under the excited utterance exception to the hearsay rule. Under this exception, a statement made after an "exciting cause" is admissible "if its utterance was spontaneous to a degree which reasonably negated premeditation or possible fabrication and if it tended to qualify, characterize and explain the underlying event." *Commonwealth* v. *Brown*, 413 Mass. 693, 695 (1992), quoting *Blake* v. *Springfield St. Ry.*, 6 Mass. App. Ct. 553, 556 (1978). Statements made up to several minutes after a shocking event took place may fall within the excited utterance exception, as long as the "statements were made under the influence of an exciting event and before the declarants had had time to contrive or fabricate the remarks." *Commonwealth* v. *Cohen*, 412 Mass. 375, 392 (1992), citing *Commonwealth* v. *Zagranski*, 408 Mass. 278, 285 (1990). See *Commonwealth* v. *DiMonte*, 427 Mass. 233 (1998); *Commonwealth* v. *Arce, supra* at 604; *Commonwealth* v. *Sellon*, 380 Mass. 220, 229-230 (1980); *Commonwealth* v. *McLaughlin*, 364 Mass. 211, 223 (1973). The event that prompted Curtis's statements to his uncle was exciting and traumatizing; Curtis's friend had just been shot before his eyes and within feet of him, and Curtis had come into contact with gunpowder and shattered glass. The record suggests that the statement was made within minutes of the shooting. Certainly there had "not been time for the exciting influence to lose its sway and to be dissipated." *Sellon, supra* at 230, quoting *McLaughlin, supra* at 223. Moreover, the statement explained the underlying event. See *Cohen, supra* at 392. The judge was well within his "broad discretion" in holding this testimony admissible. *DiMonte, supra* at 236, quoting *Commonwealth* v. *Crawford*, 417 Mass. 358, 362 (1994).

Curtis also testified about his conversations with the victim's uncle, Boston police Detective Willie Grant, which had taken

---

[8]O'Leary testified that he questioned Phillips for less than one hour and then released him to the custody of his mother. The defendant was arrested and arraigned shortly thereafter.

place at Curtis's home and at the police station. Curtis testified that Grant had said that he hoped Curtis and his friends would not go out looking for the shooter and that Grant asked Curtis to tell the police what he knew about the shooting. Curtis also testified that Grant then drove Curtis to the police station, where Curtis told the police what he had seen, including the fact that his uncle, Lanice Mikell, had been present at the time of the shooting. The defendant argues that the testimony concerning Curtis's statements to the police and his conversations with Grant were inadmissible hearsay. There was no error in admitting these statements, which were not offered for the truth of the matter asserted. Grant reportedly said to Curtis that he hoped Curtis would not take things into his own hands, that he hoped Curtis would not go out looking for the defendant, and that Curtis should tell the police what he knew. None of these statements by Grant contained a matter introduced for its truth. See *Commonwealth* v. *Repoza*, 382 Mass. 119, 129 (1980). Curtis's testimony regarding his statement to the police that Lanice Mikell had been present at the shooting was admissible to explain Curtis's other testimony that he had not, at the time of the murder, told the police that Lanice was present. See *Commonwealth* v. *Auguste*, 418 Mass. 643, 647 (1994) (testimony of two witnesses "relevant to explain why the two had not spoken candidly to the police on the night of the incident"). Cf. *Commonwealth* v. *Breese*, 381 Mass. 13, 17 (1980) (evidence showing "reason for . . . delay in identifying the defendant" is "highly relevant"). The defendant's general argument that testimony by Curtis Mikell and Jason Bly concerning why they did not speak to the police immediately after the shooting must fail for the same reason.

Finally, the defendant argues that testimony by Janice Hatcher, Curtis Mikell's aunt, was inadmissible hearsay. Hatcher testified concerning one conversation with Curtis in which Curtis had identified the defendant as the shooter and told her that Lanice Mikell had been present at the shooting. There was no error in admission of this testimony, as it was evidence of a prior consistent statement by Curtis, properly admitted to rebut the suggestion that Curtis had recently contrived his identification of the defendant. A witness's prior consistent statement is not admissible to prove the truth of the matter asserted, but only for the purpose of rebutting a claim of recent fabrication. See *Commonwealth* v. *Martinez*, 425 Mass. 382 (1997); *Com-*

*monwealth* v. *Saarela*, 376 Mass. 720 (1978); *Commonwealth* v. *Zukoski*, 370 Mass. 23 (1976). Hatcher's testimony about Curtis's statements to her identifying the defendant as the shooter was properly admitted for this purpose. The defendant's cross-examination of Curtis had inquired at length into the reasons why Curtis had not immediately informed the police of the shooter's identity, and had strongly implied that Curtis had fabricated his story. In light of this attempt to impeach Curtis, the judge was well within his discretion in "determining whether a suggestion of recent contrivance exist[ed]" and permitting the prosecution to elicit testimony showing that Curtis had identified the defendant as the shooter shortly after the murder and had not recently contrived that identification. *Zukoski, supra* at 27. See *Martinez, supra* at 397; *Commonwealth* v. *Brookins*, 416 Mass. 97 (1993); *Saarela, supra* at 723 (cross-examination showing that witness had delayed in identifying defendant to authorities would justify judge in admitting evidence of prior consistent statements). Moreover, the judge provided a limiting instruction that Hatcher's testimony was admissible only for the purpose of assessing Curtis's credibility, and not for the truth of the matter asserted.

## VI

The defendant urges us to exercise our authority under G. L. c. 278, § 33E, to order a new trial. Because we find nothing in the record indicating that the defendant's conviction was the result of a miscarriage of justice, we decline to do so.

For the reasons stated above, the judgment of the Superior Court is affirmed.

*So ordered.*